*Gore Enterprise Holdings, Inc. v. Comptroller of the Treasury* and *Future Value, Inc. v. Comptroller of the Treasury*, No. 36, September Term, 2013, Opinion by Adkins, J.

**TAX LAW – STATE INCOME TAXATION OF CORPORATIONS – AUTHORITY TO TAX OUT-OF-STATE SUBSIDIARIES WITH NO ECONOMIC SUBSTANCE AS SEPARATE BUSINESS ENTITIES:** The Court of Special Appeals correctly held that Maryland has the authority to tax two out-of-state subsidiaries that do not have economic substance as separate business entities apart from their parent corporation, a Maryland taxpayer. The taxation of such subsidiaries meets the requirements set forth by the Due Process and Commerce Clauses of the United States Constitution.

**TAX LAW – APPORTIONMENT FORMULA**: The Court of Special Appeals correctly upheld the Comptroller's use of an apportionment formula to calculate the subsidiaries' tax liability. The use of this apportionment formula was justified by the unitary business principle. The formula used was internally and externally consistent, and consequently, was fair.

*In the Matter of Future Value, Inc.*
Circuit Court for Cecil County
Case No. 07-C-10-000434

*In the Matter of Gore Enterprise Holdings, Inc.*
Circuit Court for Cecil County
Case No. 07-C-10-000435

Argued: December 6, 2013

IN THE COURT OF APPEALS

OF MARYLAND

No. 36

September Term, 2013

GORE ENTERPRISE HOLDINGS, INC.

v.

COMPTROLLER OF THE TREASURY

FUTURE VALUE, INC.

v.

COMPTROLLER OF THE TREASURY

Barbera, C.J.
Harrell
Battaglia
Greene
Adkins
McDonald
Raker, Irma S. (Retired,
         Specially Assigned),

JJ.

Opinion by Adkins, J.

Filed: March 24, 2014

Benjamin Franklin once wrote that "nothing can be said to be certain, except death and taxes."[1]  But Mr. Franklin did not promise certainty about **what** could be taxed or by **whom**.  This case allows us to bring such certainty to a particular creature in the modern corporate landscape.  To that end, we examine the Comptroller of Maryland's ("Comptroller") authority to tax the income of two out-of-state subsidiary corporations based on the subsidiaries' relationship with their Maryland parent, the subsidiaries' substance as corporations, and all the entities' activity in Maryland.

## FACTS AND LEGAL PROCEEDINGS[2]

W.L. Gore & Associates, Inc. ("Gore") is a specialty manufacturing company headquartered in Newark, Delaware.  Incorporated in Delaware in 1959, Gore is known for its patented "ePTFE" material, which it uses to manufacture fabrics, medical devices, electronics, and industrial products.  Gore operates factories in several states, including Maryland.  Gore has actively enforced patents that protect its numerous inventions since 1979.

On July 13, 1983, Gore created Gore Enterprise Holdings, Inc. ("GEH") as a wholly-owned subsidiary to manage a portfolio of Gore patents.  GEH was organized in Delaware as a holding company.  Shortly after GEH's incorporation, Gore assigned GEH its entire patent portfolio, a nominal sum of cash, and 1,000 shares in a domestic international sales

---

[1]Letter from Benjamin Franklin to Jean-Baptiste Le Roy (November 13, 1789), in 10 *The Works of Franklin* at 410 (Jared Sparks ed. 1840).

[2]We enrich our recitation of the facts, including the various decisions of the lower courts, in our Discussion section, *infra*.

corporation ("DISC"), in exchange for all of GEH's stock. GEH then licensed back its patent portfolio to Gore in exchange for a 7.5% royalty of the sales price of all products that Gore sold in the United States.

In 1995, GEH executed a "Legal Services Consulting Agreement" with Gore. Under this agreement, GEH pays Gore attorneys to perform the following work for GEH:

- Prosecution of patent applications, domestic and foreign.

- Conduct or manage litigation or defense of patents against infringement.

- Provide advice with respect to utilization of outside counsel.

- Counsel, conduct or manage applications to foreign patents and applications.

- Counsel with respect to patent infringement, domestic and foreign.

- Counsel with respect to interferences with pending patents.

- Counsel with respect to licensing negotiations and activities.

Gore employees generate research and ideas that are sent to GEH for patent application filing. Until GEH hired one employee and began to pay Gore rent for use of its office space in 1995, GEH had almost no substantial annual expenses. This employee was hired as a Patent Administrator to manage the patent portfolio, implement decisions of the GEH Board of Directors, and report on GEH activities to its Board of Directors. These

2

activities include the licensing of GEH patents to Gore and to third parties, the acquisition of patents from third parties, and the enforcement of GEH's patent portfolio.

In January of 1996, Future Value, Inc. ("FVI") was incorporated in Delaware to manage Gore's excess capital. A Gore-employed attorney incorporated it, and two members of the Gore Board, along with GEH's Vice President, comprised the FVI Board. Upon FVI's formation, GEH transferred all of its investment securities[3] to FVI, in exchange for all of the shares of FVI. GEH then declared a dividend to its sole shareholder, Gore, in the form of the FVI stock. This made Gore the sole owner of FVI. FVI was founded primarily to perform investment management functions, but has also extended Gore a line of credit when Gore experienced negative cash flow. As of 2008, FVI had three employees that handled, monitored, and recorded the various activities performed by FVI.

The Comptroller audited Gore, GEH and FVI in 2006. On July 3, 2006, the Comptroller issued the following assessments of tax, interest and penalties: $26,436,315 against GEH for tax years 1983 to 2003; $2,608,895 against FVI for tax years 1996 to 2003; and $193,178 against Gore for tax years 2001 to 2003. A hearing officer in the Comptroller's office upheld the assessments, plus interest for the time between the Comptroller's assessment and the hearing, in separate decisions entitled "Notice of Final Determination" filed on January 5, 2007. GEH and FVI (together, "Petitioners"), along with Gore, appealed to the Maryland Tax Court ("the Tax Court").

---

[3]It is unclear from the record before us the source of these securities.

3

After hearings in October 2008 and May 2009, the Tax Court affirmed the assessments of tax and interest against GEH and FVI, but abated the penalties. Additionally, the Tax Court dismissed the alternative assessment against Gore. Petitioners appealed to the Circuit Court for Cecil County, arguing that Maryland's taxation of GEH and FVI violated the Due Process and Commerce Clauses of the U.S. Constitution. The Circuit Court agreed, reversing the Tax Court. The Comptroller appealed to the Court of Special Appeals, which reversed the Circuit Court, thereby upholding the Comptroller's assessments. *See Comptroller of the Treasury v. Gore Enterprise Holdings, Inc.*, 209 Md. App. 524, 60 A.3d 107 (2013).

GEH and FVI then petitioned this Court for a writ of certiorari, which we granted to answer the following questions:[4]

---

[4]We significantly rephrase and consolidate Petitioners' "Questions Presented" from how they appeared in the original petition and briefs. To be sure, our ensuing discussion will address each of the queries in Petitioners' original "Questions Presented," which appeared as follows:

> 1. The General Assembly has considered numerous bills that would make Maryland a combined/unitary reporting jurisdiction - and rejected all of them. Did the Court of Special Appeals err in applying a unitary business standard to establish nexus?

> 2. Before Maryland can tax an entity, the U.S. Constitution and Maryland law require that Maryland have a nexus with it. Only after a nexus has been established may the state assess the nature of the entity's "unitary business" to determine the amount of tax for which it is liable.

(continued...)

4

1) Did the Tax Court err in holding that the Comptroller had authority to tax GEH and FVI under this Court's holding in *Comptroller of the Treasury v. SYL, Inc.*, 375 Md. 78, 825 A.2d 399 (2003)?

---

[4](...continued)

    a.    This Court has held that out-of-state subsidiaries otherwise lacking nexus are directly taxable only if they lack economic substance. Did the Court of Special Appeals err in holding that this Court intended "economic substance" to be a mere synonym for the unitary business principle?

    b. The United States Supreme Court has held that the unitary business principle relates to apportionment of income, not to the threshold requirement of nexus. Did the Court of Special Appeals err in conflating the nexus requirement with the unitary business principle?

    c. Did the Court of Special Appeals lower the showing required to disregard the corporate form by holding that a subsidiary is, in effect, a division of the parent, doing business everywhere the parent does business?

3. Under Maryland law, tax liability for multi-state corporations with gross income from intangible items is apportioned using a two-factor formula based on property and payroll in Maryland. Did the Court of Special Appeals err in holding that a binding regulation was inapplicable because that regulation demonstrated that petitioners had no Maryland tax liability?

4. Under federal law, a patent is used only when the patent holder exercises its patent rights to exclude others from the invention. Did the Court of Special Appeals err in defining the "use" of a patent to include the manufacture or sale of a product by a patent licensee?

2) Did the Tax Court err in upholding the apportionment formula used by the Comptroller in its assessment of GEH and FVI?

For the reasons discussed below, we agree with the Tax Court, and consequently answer both questions in the negative. We therefore affirm the judgment of the Court of Special Appeals.

## DISCUSSION

The Maryland Tax Court is "'an adjudicatory administrative agency[.]'" *Frey v. Comptroller of the Treasury*, 422 Md. 111, 136, 29 A.3d 475, 489 (2011) (quoting *Furnitureland S., Inc. v. Comptroller of the Treasury*, 364 Md. 126, 137 n.8, 771 A.2d 1061, 1068, n.8 (2001)). Thus, decisions of the Tax Court receive the same judicial review as other administrative agencies. *Id.* (Citations omitted). In this context, "our review looks 'through the circuit court's and intermediate appellate court's decisions . . . and evaluates the decision of the agency.'" *Frey*, 422 Md. at 136–37, 29 A.3d at 489 (quoting *People's Counsel for Baltimore Cnty. v. Surina*, 400 Md. 662, 681, 929 A.2d 899, 910 (2007)). We cannot uphold the Tax Court's decision "on grounds other than the findings and reasons set forth by [the Tax Court]." *Frey*, 422 Md. at 137, 29 A.3d at 489–90 (citing *Evans v. Burruss*, 401 Md. 586, 593, 933 A.2d 872, 876 (2007); *Dep't of Health & Mental Hygiene v. Campbell*, 364 Md. 108, 123, 771 A.2d 1051, 1060 (2001)). Indeed, our review is narrow, and we will not "'substitute [our] judgment for the expertise of those persons who constitute the administrative agency.'" *Frey*, 422 Md. at 137, 29 A.3d at 490 (quoting *People's Counsel*

6

*for Baltimore Cnty. v. Loyola College in Md.*, 406 Md. 54, 66, 956 A.2d 166, 173 (2008)).

An administrative agency's findings of fact must meet the substantial evidence standard. *Frey*, 422 Md. at 137, 29 A.3d at 490 (citations omitted). Thus, we determine "'whether a reasoning mind reasonably could have reached the factual conclusion the agency reached.'" *Frey*, 422 Md. at 137, 29 A.3d at 490 (quoting *State Ins. Comm'r v. Nat'l Bureau of Cas. Underwriters*, 248 Md. 292, 309, 236 A.2d 282, 292 (1967)). It is not our place to "make an independent original estimate of or decision on the evidence. . . . [or determine for ourselves], as a matter of first instance, the weight to be accorded to the evidence before the agency." *Ramsay, Scarlett & Co., Inc. v. Comptroller of the Treasury*, 302 Md. 825, 838, 490 A.2d 1296, 1303 (1985) (citations omitted). In *Ramsay,* we cautioned:

> [T]hat a reviewing court may not substitute its judgment for the expertise of the agency; that we must review the agency's decision in the light most favorable to it; that the agency's decision is prima facie correct and presumed valid; and that it is the agency's province to resolve conflicting evidence and where inconsistent inferences can be drawn from the same evidence it is for the agency to draw the inferences.

*Ramsay*, 302 Md. at 834–35, 490 A.2d at 1301 (citations omitted).

"[T]he interpretation of the tax law can be a mixed question of fact and law, the resolution of which requires agency expertise." *Comptroller of the Treasury v. Citicorp Int'l Commc'ns, Inc.*, 389 Md. 156, 164, 884 A.2d 112, 116–17 (2005) (citing *NCR Corp. v. Comptroller*, 313 Md. 118, 133–34, 544 A.2d 764, 771 (1988)). In reviewing mixed questions of law and fact, "we apply 'the substantial evidence test, that is, the same standard

7

of review [we] would apply to an agency factual finding.'" *Comptroller of the Treasury v. Science Applications Intern. Corp.*, 405 Md. 185, 193, 950 A.2d 766, 770 (2008) (quoting *Longshore v. State*, 399 Md. 486, 522 n.8, 924 A.2d 1129, 1149 n.8 (2007)).

The legal conclusions of an administrative agency that are "premised upon an interpretation of the statues that the agency administers" are afforded "great weight." *Frey*, 422 Md. at 138, 29 A.3d at 490 (citations omitted). Agency decisions premised upon case law, however, are not entitled to deference. *Frey*, 422 Md. at 138, 29 A.3d at 490 ("When an agency's decision is necessarily premised upon the 'application and analysis of caselaw,' that decision rests upon 'a purely legal issue uniquely within the ken of a reviewing court.'" (quoting *Loyola College*, 406 Md. at 67–68, 956 A.2d at 174)).

### I. Maryland's Authority to Tax GEH and FVI

Petitioners argue that Maryland does not have the authority to tax GEH and FVI. Specifically, Petitioners deny that GEH and FVI have sufficient "nexus" with Maryland for the Comptroller's assessment of taxes to be constitutional under the Due Process and Commerce Clauses. Petitioners first argue that it was legal error for the Tax Court to find nexus between Maryland and GEH and FVI based on the unitary business principle.[5] Additionally, while acknowledging that our holding in *Comptroller of the Treasury v. SYL, Inc.*[6] allows the Comptroller and the Tax Court to find nexus when a subsidiary lacks

---

[5]We discuss the unitary business principle *infra*.

[6]The United States Supreme Court denied *certiorari* to both petitioners from the
(continued...)

8

economic substance, Petitioners contend that both GEH and FVI have such substance. Petitioners contend that to hold otherwise would wrongfully expand *SYL*'s ambit from the "phantom entities" and "mail drops" at issue in that case.

Petitioners also present three peripheral arguments. The first is that the Tax Court improperly usurped a legislative function because treating Gore and its subsidiaries as a unitary business transformed Maryland from a "separate" to a "combined" reporting state. Second, Petitioners contend that Maryland's efforts to tax GEH and FVI violated the State's long-held doctrine of respect for the corporate form. Finally, Petitioners argue that the Tax Court's holding that GEH's patents were used in Maryland by virtue of Gore manufacturing or selling products in the State is contrary to federal patent law, and wrongly blurs a long-held distinction between patents and trademarks.

Respondent rejoins that the Tax Court did not rely solely on the unitary business principle to establish GEH's and FVI's nexus with Maryland. Rather, Respondent contends that the Tax Court found that nexus was "established by the economic reality that the parent's business in Maryland produced the subsidiaries' apportioned income." Essentially, Respondent alleges that although the Gore subsidiaries were not identical to the companies at issue in *SYL*, they were sufficiently dependent on their parent (Gore) for the subsidiaries

---

[6](...continued)
consolidated *SYL* case. *See SYL, Inc. v. Comptroller of the Treasury*, 540 U.S. 984, 124 S. Ct. 478 (2003); *Crown Cork & Seal Co. (Delaware), Inc. v. Comptroller of the Treasury*, 540 U.S. 1090, 124 S. Ct. 961 (2003). We further discuss our judgment in *Comptroller of the Treasury v. SYL, Inc.*, 375 Md. 78, 825 A.2d 399 (2003), *infra*.

9

to fit within the *SYL* framework.

Respondent also counters Petitioners' three peripheral arguments. First, Respondent fails to see the connection between recognizing the lack of distinction between Gore and its subsidiaries—for purposes of establishing nexus—and Maryland's separate reporting requirements. Second, Respondent finds inapposite Petitioners' argument concerning Maryland taxation and the respect for corporate form enshrined in Maryland precedent. Finally, Respondent disclaims the import of the functional distinction between patents and trademark for purposes of establishing nexus in this case.

We begin by examining the bedrock constitutional principles that must be satisfied before an entity is subject to Maryland income tax. "Under both the Due Process and the Commerce Clauses of the Constitution, a state may not, when imposing an income-based tax, 'tax value earned outside its borders.'" *Container Corp. of America v. Franchise Tax Bd.*, 463 U.S. 159, 164, 103 S. Ct. 2933, 2939 (1983) (quoting *ASARCO Inc. v. Idaho State Tax Comm'n*, 458 U.S. 307, 315, 102 S. Ct. 3103, 3108 (1982)). "[B]oth the Due Process and Commerce Clauses [require] that there be 'some definite link, some minimum connection, between a state and the person, property or transaction it seeks to tax.'" *Allied-Signal, Inc. v. Dir., Div. of Taxation*, 504 U.S. 768, 777, 112 S. Ct. 2251, 2258 (1992) (quoting *Miller Bros. Co. v. Maryland*, 347 U.S. 340, 344–45, 74 S. Ct. 535, 539 (1954)). Lest the shared elements of the two inquiries spawn confusion, we underscore that the two constitutional provisions are distinct, and "reflect different constitutional concerns." *Quill Corp. v. North*

10

*Dakota By and Through Heitkamp*, 504 U.S. 298, 305, 112 S. Ct. 1904, 1909 (1992).

The Due Process Clause imposes the requirement of fairness on governmental activity. *Quill*, 504 U.S. at 312, 112 S. Ct. at 1913. The "touchstone" of due process is "fair warning." *Id*. This fairness is preserved by requiring that an outside business have a "'minimal connection' between the interstate activities and the taxing State, and a rational relationship between the income attributed to the State and the intrastate values of the enterprise." *Mobil Oil Corp. v. Comm'r of Taxes of Vermont*, 445 U.S. 425, 436–37, 100 S. Ct. 1223, 1231 (1980) (quoting *Moorman Mfg. Co. v. Bair*, 437 U.S. 267, 272–73, 98 S. Ct. 2340, 2344 (1978)). Physical presence is not required to satisfy due process, so long as the business engages in some purposeful direction to the state. *See Quill*, 504 U.S. at 308, 112 S. Ct. at 1911.

The Commerce Clause, by contrast, is chiefly concerned with "the effects of state regulation on the national economy." *Quill*, 504 U.S. at 312, 112 S. Ct. at 1913. Taxation satisfies the Commerce Clause by passing a four-part test, requiring that "'the tax is applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State.'" *Trinova Corp. v. Michigan Dep't of Treasury*, 498 U.S. 358, 372, 111 S. Ct. 818, 828 (1991) (quoting *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 279, 97 S. Ct. 1076, 1079 (1977)). Hence, the inquiries under the Due Process and Commerce Clauses "impose distinct but parallel limitations on a State's power to tax out-of-state activities."

11

*MeadWestvaco Corp. ex rel. Mead Corp. v. Illinois Dep't of Revenue*, 553 U.S. 16, 24, 128

S. Ct. 1498, 1505 (2008) (citations omitted).

The *MeadWestvaco* Court identified the lodestar of these parallel inquiries as

"'whether the state has given anything for which it can ask return.'" *MeadWestvaco*, 553

U.S. at 24–25, 128 S. Ct. at 1505 (quoting *ASARCO*, 458 U.S. at 315, 102 S. Ct. at 3108).

In *MeadWestvaco*, the Ohio-based corporation challenging its taxation had undoubtedly done

business in the taxing state of Illinois, but this multi-state enterprise questioned which

portions of its generated value Illinois could tax. 553 U.S. at 25, 128 S. Ct. at 1505. For that

purpose, the court turned to the unitary business principle. *Id.*

Under the unitary business principle, the State is authorized to tax the portion of value

that a unitary business derived from its operation within the particular state. *MeadWestvaco*,

553 U.S. at 26, 128 S. Ct. at 1506. In essence, the principle "shift[s] the constitutional

inquiry from the niceties of geographic accounting to the determination of the taxpayer's

business unit." *Id.* The unitary business principle enables taxation by apportionment when

the characteristics of "functional integration, centralized management, and economies of

scale" are present. *MeadWestvaco*, 553 U.S. at 30, 128 S. Ct. at 1508. When a "'discrete

business enterprise'" is responsible for that value, then the State cannot tax that value, even

by apportionment. *MeadWestvaco*, 553 U.S. at 26, 128 S. Ct. at 1506 (quoting *Mobil Oil

Corp.*, 445 U.S. at 439, 100 S. Ct. at 1233).

We must be clear about what the unitary business principle allows. The principle can

12

be used to "'tax an apportioned sum of [a] corporation's multistate business if the business is unitary.'" *MeadWestvaco*, 553 U.S. at 25, 128 S. Ct. at 1505 (quoting *Allied-Signal*, 504 U.S. at 772, 112 S. Ct. at 2255). But the principle does not confer nexus to allow a state to **directly** tax a subsidiary based on the fact that the **parent** company is taxable and that the **parent and subsidiary are unitary**. *See id.* ("Where . . . there is no dispute that the taxpayer has done some business in the taxing State, the inquiry shifts from whether the State may tax to what it may tax. . . . To answer that question, we have developed the unitary business principle.") (citations omitted). Where, as here, the taxpayer disputes its nexus with Maryland, the unitary business principle cannot be used to clear the constitutional hurdles of the Due Process and Commerce Clauses.

Indeed, the Petitioners have argued strenuously that the unitary business principle is not a jurisdictional principle, and cannot be used to satisfy nexus inquiries under either the Due Process Clause or Commerce Clause. This Court has fully embraced that position, as demonstrated by our explanation in *NCR Corp. v. Comptroller of the Treasury*:

> Apportionment under the unitary business formula, however, is not without its restrictions. The due process and commerce clauses do not allow states to tax a corporation's interstate activities unless there exists a "'minimal connection' or 'nexus' between the interstate activities and the taxing State, and 'a rational relationship between the income attributed to the State and the intrastate values of the enterprise.'"

313 Md. 118, 131–32, 544 A.2d 764, 770 (1988) (quoting *Exxon Corp. v. Wisconsin Dep't of Revenue*, 447 U.S. 207, 219–20, 100 S. Ct. 2109, 2118 (1980)). Thus, *NCR* made clear

13

that the unitary business principle cannot satisfy the constitutional requirements of the Due

Process and Commerce Clauses; rather, it is a principle that allows apportionment of entities

already deemed taxable. In other words, before apportionment is employed, a state must first

satisfy the constitutional requirements to levy a tax.[7]

This Court has been asked to evaluate Maryland's authority to tax against the

foregoing constitutional precepts in many cases. *See*, *e.g.*, *Hercules Inc. v. Comptroller of*

*the Treasury*, 351 Md. 101, 716 A.2d 276 (1998); *NCR*, 313 Md. 118, 544 A.2d 764 (1988);

*Comptroller of the Treasury v. Atlantic Supply Co.*, 294 Md. 213, 448 A.2d 955 (1982);

---

[7]Professor Walter Hellerstein, an authority on state income taxation, advances the same position. *See* Walter Hellerstein, *A Unitary Business is the 'Linchpin of Apportionability,' Not Nexus*, State Tax Notes, March 18, 2013, at 865. ("[Unitary Business] is *not* a jurisdictional principle.") (italics in original). As Professor Hellerstein stated:

> [T]he existence of a unitary relationship between an in-state and an out-of-state corporation does not, by itself, establish nexus over the out-of-state affiliate . . . . Rather, it is a principle that establishes the link between property or income that lies *outside* the state's jurisdiction (in a territorial sense) in order to permit the state, through a reasonable apportionment formula, to determine the value of property or the amount of income that is fairly attributable to the state for tax purposes.

*Id*. at 865. (Footnote omitted.)

Despite arguing that the Court of Special Appeals wrongly relied on the unitary business principle to establish nexus, Professor Hellerstein considered this a harmless error of reasoning, given that Maryland law provided alternative "adequate grounds for finding that Maryland had nexus with the out-of-state corporations by attributing the activities of the in-state parent to the out-of-state subsidiary that lacked economic substance." *Id*. at 865–67. We examine this contention *infra*.

14

*Xerox Corp. v. Comptroller of the Treasury*, 290 Md. 126, 428 A.2d 1208 (1981). One of

our more recent cases, *Comptroller of the Treasury v. SYL, Inc.*, shares many factual

similarities to the present case. 375 Md. 78, 825 A.2d 399 (2003). Thus, we will now

examine *SYL* and its applicability to this case.[8]

*SYL* concerned Maryland's ability to tax two distinct companies[9] that had little

obvious connection to Maryland, but were subsidiaries of parent companies that had

significant business ties with the State. *SYL*, 375 Md. at 80, 825 A.2d at 400. The first

subsidiary, SYL, Inc. was a Delaware corporation, and wholly owned subsidiary of Syms,

Inc. *SYL*, 375 Md. at 81, 825 A.2d at 400. Syms, Inc. was a New Jersey corporation that

sold clothing in many states, including Maryland. *Id*. By contrast, SYL's primary function

was to manage the trademarks, trade names and advertising slogans used by Syms. *Id*.

Syms incorporated SYL in 1986, assigning it trademarks in return for a license to

manufacture, use, and sell the covered products. *Id*. Syms also agreed to pay SYL a royalty

based on these sales. *SYL*, 375 Md. at 81, 825 A.2d at 400–01. From 1986 to 1993, SYL did

---

[8]Our effort is informed by two guiding principles. First, this Court does not overrule its own precedent in the absence of blatant error, grave injustice or "significant changes in the law or facts." *DRD Pool Service, Inc. v. Freed*, 416 Md. 46, 64, 5 A.3d 45, 56 (2010) (citations omitted). Second, as further discussed *infra*, "it is clear [that] the legislative purpose underlying [Md. Code Ann. (1988, 2010 Repl. Vol.), § 10-402 of the Tax-General Article] is to tax multi-state corporations doing business in this State to the full extent permitted by the United States Constitution." *Classics Chicago, Inc. v. Comptroller of the Treasury*, 189 Md. App. 695, 713, 985 A.2d 593, 604 (2010) (citations omitted).

[9]The *SYL* opinion consolidated two cases: *Comptroller of the Treasury v. SYL, Inc.* and *Comptroller of the Treasury v. Crown Cork & Seal Company (Delaware), Inc.* See *Comptroller of the Treasury v. SYL, Inc.*, 375 Md. 78, 825 A.2d 399 (2003).

15

not have property, employees, or accounts in Maryland, and did not file corporate income taxes in Maryland. *SYL*, 375 Md. at 81, 825 A.2d at 401.

SYL was established in Delaware with the help of Gunnip & Company. *SYL*, 375 Md. at 86, 825 A.2d at 404. Gunnip provided SYL with a Delaware address and mail forwarding; however, SYL's office "lacked a phone listing, had no office sign, and no business cards." *SYL*, 375 Md. at 87, 825 A.2d at 404. SYL's Board of Directors was dominated by officers of the parent, and was comprised of Syms' CEO, COO, CFO, and an accountant from Gunnip. *Id*. This Gunnip accountant also held the distinction of being SYL's sole employee, with a $1200 annual salary. *Id*.

Despite SYL's purpose of maintaining Syms' trademarks, SYL incurred no legal expenses for outside trademark counsel. *Id*. Syms' CFO stated that any such expenses "'were probably paid for by Syms Corp.'" *Id*. Indeed, the license agreement between Syms and SYL authorized Syms to take charge of the trademark management—a task that was supposed to be SYL's only responsibility. *SYL*, 375 Md. at 87–88, 825 A.2d at 404.[10] Finally, SYL's financial records lacked any evidence to establish SYL's economic substance. *SYL*, 375 Md. at 88, 825 A.2d at 405.

The second subsidiary in this consolidated case, Crown Cork & Seal ("Crown Delaware"), was a Delaware Corporation wholly owned by parent Crown Cork & Seal

---

[10]In testimony, the Syms, Inc. employees were described as performing these duties "when they were wearing their SYL 'hats.'" *SYL*, 375 Md. at 88, 825 A.2d at 405.

Company ("Crown Parent"). *SYL*, 375 Md. at 92, 825 A.2d at 407. Crown Delaware's main function was to manage and control 13 domestic patents and 16 trademarks. *Id*. Crown Parent manufactured and sold metal cans and bottles worldwide, including in Maryland. *Id*. From 1989 to 1993, Crown Delaware did not file corporate income taxes in Maryland. *Id*.

Crown Delaware was incorporated in 1989 when Crown Parent assigned it intellectual property[11] in exchange for all of Crown Delaware's issued stock. *SYL*, 375 Md. at 94, 825 A.2d at 408. Crown Delaware granted Crown Parent an exclusive license to manufacture items covered by Crown Delaware's intellectual property in exchange for a royalty based on sales. *Id*. Like SYL, Crown Delaware had no property, employees, or accounts in Maryland. *SYL*, 375 Md. at 92, 825 A.2d at 407.

Crown Delaware also employed a third party to establish its operations in Delaware. *SYL*, 375 Md. at 94, 825 A.2d at 408. Organization Services, Inc. ("OSI"), a nexus-service company,[12] subleased Crown Delaware desk space, conference rooms, and a telephone number for up to $100 per month. *SYL*, 375 Md. at 95, 825 A.2d at 409. Crown Delaware also hired nine OSI employees to manage its daily operations. *SYL*, 375 Md. at 96, 825 A.2d at 409. These part-time clerical employees received relatively paltry wages for working in

---

[11]This intellectual property included both trademarks and patents. *SYL*, 375 Md. at 92, 825 A.2d at 407.

[12]As described in *SYL*, OSI advertised itself as providing "'complete services for corporations to minimize state taxes'" by helping subsidiaries set up business operations in Delaware. *SYL*, 375 Md. at 94–95, 825 A.2d at 408–09. The purpose of these services was to help subsidiaries "'satisfy other states as to its situs within Delaware.'" *SYL*, 375 Md. at 95, 825 A.2d at 409.

a corporation earning thirty million dollars per year. *Id*. Their responsibilities did not require intellectual property expertise. *Id*. Those duties were performed by the same patent law firms that handled Crown Parent's intellectual property issues before Crown Delaware's creation. *SYL*, 375 Md. at 97, 825 A.2d at 410. In reality, it was Crown Parent—the only party to whom Crown Delaware could license intellectual property—that had responsibility for maintaining and defending the validity and ownership of the intellectual property. *SYL*, 375 Md. at 97–98, 825 A.2d at 410.

Although Crown Parent did make royalty payments to Crown Delaware, those payments were immediately loaned back to Crown Parent. *SYL*, 375 Md. at 96, 825 A.2d at 409–10. This circular flow corresponded with the absence of the usual corporate formalities that "normally serve to separate a parent corporation from its subsidiary[.]" *SYL*, 375 Md. at 98, 825 A.2d at 410. These included Crown Parent officers and directors "signing documents as Crown Delaware's officers when in fact they [were] not officers[.]" *Id.* In fact, officers of the nexus service company, OSI, served as officers and directors of Crown Delaware. *SYL*, 375 Md. at 96, 825 A.2d at 409. Finally, Crown Delaware's balance sheets were devoid of the regular costs of running business that corporations normally incur. *SYL*, 375 Md. at 97, 825 A.2d at 410.

After examining the structure and operation of the two subsidiaries, we then analyzed Maryland's authority to tax under constitutional precepts. We held that the constitutional requirements for state taxation were satisfied by virtue of the fact that SYL and Crown

Delaware "had no real economic substance **as separate business entities.**" *SYL*, 375 Md. at 106, 825 A.2d at 415. (Emphasis added). We described the SYL and Crown Delaware subsidiaries as follows:

> Neither subsidiary had a full time employee, and the ostensible part time "employees" of each subsidiary were in reality officers or employees of independent "nexus-service" companies. The annual wages paid to these "employees" by the subsidiaries were minuscule. The so-called offices in Delaware were little more than mail drops. The subsidiary corporations did virtually nothing; whatever was done was performed by officers, employees, or counsel of the parent corporations. The testimony indicated that, with respect to the operations of the parents and the protections of the trademarks, nothing changed after the creation of the subsidiaries. Although officers of the parent corporations may have stated that tax avoidance was not the sole reason for the creation of the subsidiaries, the record demonstrates that sheltering income from state taxation was the predominant reason for the creation of SYL and Crown Delaware.

*Id*. Given these characteristics, we felt confident in holding that a portion of the subsidiaries' income could be taxed, "based upon their parent corporations' Maryland business[.]" *SYL*, 375 Md. at 109, 825 A.2d at 417.

With this exposition in mind, we must now determine whether the Tax Court was correct in holding that Maryland could tax GEH and FVI consistent with our opinion in *SYL*. In its "MEMORANDUM OF GROUNDS FOR DECISION," the Tax Court concluded its reasoning as follows:

> Maryland courts have consistently concluded that the basis of a nexus sufficient to justify taxation is the economic reality of the fact that the parent's business in Maryland was what produced

19

the income of the subsidiary. *The Classics Chicago, Inc., et al [v.] Comptroller of the Treasury*, 189 Md. App. 593 (2010); *Comptroller of the Treasury v. SYL, Inc.*, 375 Md. 78, cert. denied 540 U.S. 982 and 540 U.S. 1090 (2003). Thus, the resolution of this case depends on whether GEH and FVI as out-of-state affiliates had real economic substance as business entities separate from W.L. Gore.

This Court's previous interpretation of the facts support the Comptroller's position that GEH and FVI were engaged in a unitary business with W. L. Gore and are not separate business entities. GEH and FVI depend on W. L. Gore for their existence. The facts indicate functional integration and control through stock ownership, as well as common employees, directors and officers of W. L. Gore and the Gore [f]amily. The functional source of GEH's income is derived from the ideas and discoveries generated by W. L. Gore employees. The circular flow of money is traced by and through W. L. Gore when GEH acquires a patent from the ideas and discoveries of W. L. Gore. The income of GEH is derived from a royalty paid by W. L. Gore under a license agreement on the patent.

In addition, the facts also indicate GEH's reliance on W. L. Gore personnel, office space and corporate services. The tax returns and other financial data reflect the lack of separate substantial activity of GEH or FVI. Moreover, the evidence also demonstrates that FVI is taxable by Maryland on its intercompany loan income. FVI is inextricably connected to the royalty income generated by W. L. Gore and paid to GEH. There is a circular flow of money through royalties, dividends and loans which support the unitary business of W. L. Gore and its wholly owned subsidiaries, GEH and FVI.

The Court finds that substantial nexus exists between GEH and FVI with the State of Maryland, and that the Comptroller has fairly apportioned the tax on income through its apportionment formula. Under the circumstances of this case, the Court will abate the penalty but affirm the assessments of tax and interest against GEH and FVI. The alternative assessment against W. L. Gore is dismissed.

(Emphasis in original).

Thus, the Tax Court identified the correct legal standard, inquiring whether GEH and FVI were subsidiaries with "no real economic substance **as separate business entities**" under *SYL*. *SYL*, 375 Md. at 106, 825 A.2d at 415 (emphasis added). In applying this legal standard to GEH and FVI, the Tax Court marshaled numerous factual findings, supported by substantial record evidence.[13] These included the following:

- There were no outside Directors of GEH or FVI and prior to 1996 the W. L. Gore family dominated the Officer list.

- FVI was simply an intentional depository for assets built up through royalties paid to the patent company, GEH.

- In effect, GEH does not create, invent or make anything and must rely on W. L. Gore employees to invent the new process or product. Thus, an idea generated by a technologist with W. L. Gore is prepared by GEH through an application for filing with the patent office. In most cases, the employees of W.L. Gore review the patent application and determine whether it should be pursued.

---

[13]We underscore that our review of the Tax Court's factual findings is limited by this Court's controlling precedents. *See supra*. This Court is not a trier of fact, and we do not "make an independent original estimate of or decision on the evidence." *See supra*. Rather, we review the record and determine whether a reasoning mind could have reasonably reached the factual conclusions of the Tax Court. *See id*. Both the findings of the Tax Court and the record materials contain less granularity and clarity than we might wish. Nevertheless, we find that the Tax Court's findings meet the substantial evidence standard. *See CBS Inc. v. Comptroller of the Treasury*, 319 Md. 687, 697–98, 575 A.2d 324, 329 (1990) ("Although the record is not as full as we might wish, we think it was sufficient to support the fact-finding of the Tax Court, made in light of its special expertise in this area.").

- The testimony in the case suggests that GEH relied on W. L. Gore for a continuing stream of inventions and discoveries as set forth in the materials that make up the patent application.

- The manufacture or sale of the product by W. L. Gore obligates the payment of royalties to GEH under the License Agreement.

- GEH as licensor to W. L. Gore, Inc., licensee, is dependent on the licensee's activities to obtain consideration for grants of the license. Although GEH has separate corporate status, the inter-dependence reflected in the third party License Agreements suggests that the patent committee of GEH strongly considers the interest of W. L. Gore in making its decisions.

- One witness for GEH who described herself as a Patent Administrator confirmed that W. L. Gore employees would prepare patent applications at no cost to GEH and that payments were made for GEH in accordance with the Service Agreement with W. L. Gore.

- [An economist for Petitioners] agreed that W. L. Gore and GEH had globally integrated goals and that a synergy existed between W. L. Gore and GEH due to the relationship between patents and products.

- Testimony from [] Petitioners' witnesses consistently suggested that nearly all of the third-party licenses came about in order to produce benefits for W. L. Gore or for the "W. L. Gore family of companies."

- In 1996, W. L. Gore was experiencing some negative cash flow when W. L. Gore asked FVI for a line of credit to meet current operating needs which continued through 1999. The inter-company loans reflected the inter-company dependence of FVI.

- The audits reflected through the inter-corporate transactions and Service Agreement that the Delaware Holding Companies relied on W. L. Gore for revenues and services.

From these findings, the Tax Court highlighted the subsidiaries' dependence on Gore for their income, the circular flow of money between the subsidiaries and Gore, the subsidiaries' reliance on Gore for core functions and services, and the general absence of substantive activity from either subsidiary that was in any meaningful way separate from Gore.

The court then properly applied *SYL*, relying on these indisputable parallels between GEH, FVI and the SYL subsidiaries to hold that GEH and FVI lacked substance apart from Gore, and consequently satisfied the constitutional requirements for taxation in Maryland.[14]

Within this analysis, the Tax Court also stated that the subsidiaries were each engaged in a unitary business with Gore. We do not find this observation to be inapposite, much less fatal to the Tax Court's application of *SYL*. Although the unitary business principle and economic substance inquiry under *SYL* are distinct inquiries with distinct purposes, there is no reason—based either in case law or logic—for holding that the factors that indicate a

_____

[14]Professor Hellerstein, in expressing his agreement with the result in *Comptroller of the Treasury v. Gore Enterprise Holdings, Inc.*, 209 Md. App. 524, 60 A.3d 107 (2013), stated that "there were adequate grounds for finding that Maryland had nexus with the out-of-state corporations by attributing the activities of the in-state parent to the out-of-state subsidiary that lacked economic substance." Hellerstein at 867. For this reason, Professor Hellerstein found the holding of the Court of Special Appeals to be "constitutionally unobjectionable." *Id*.

unitary business cannot also be relevant in determining whether subsidiaries have no real economic substance as separate business entities. *See* Walter Hellerstein, *A Unitary Business is the 'Linchpin Of Apportionability,' Not Nexus*, State Tax Notes, March 18, 2013, at 866, n.8 ("This is not to suggest, however, that some of the factors that determine whether two corporations are engaged in a unitary business might not also be relevant in determining whether there is a nexus with one or both of those corporations."); *see also* John A. Swain, *Cybertaxation and the Commerce Clause: Entity Isolation or Affiliate Nexus*, 75 S. Cal. L. Rev. 419, 424 (2002) ([T]he [Supreme] Court has addressed "attributional nexus," "divisional nexus," and "unitary business" principles, all of which serve as building blocks for a theory of affiliate nexus.").[15]

Aside from the facial differences between GEH, FVI, and the subsidiaries in *SYL*, the Petitioners have attempted to distinguish this case on several other grounds. First, Petitioners claim that GEH and FVI were created for legitimate business reasons. Second, Petitioners argue that unlike the subsidiaries in *SYL*, GEH and FVI engage in substantial activities that highlight their substance as separate entities from their parent, Gore. Finally, Petitioners contend that all the transactions between Gore and its subsidiaries were at arm's length or at market rates.

---

[15]"In this context, 'affiliate nexus' means to assert state tax jurisdiction over a remote [corporation] by virtue of the in-state physical presence of a corporate affiliate." John A. Swain, *Cybertaxation and the Commerce Clause: Entity Isolation or Affiliate Nexus*, 75 S. Cal. L. Rev. 419, 424 n. 24 (2002).

24

Here, we first observe that Petitioners' brief made reference to "the *SYL* economic substance standard." This formulation is a misnomer, for as we explained, our inquiry under *SYL* requires us to determine whether the subsidiaries have economic substance **as separate entities**. Under this lens, the motivation behind creating the entities, although invoked in *SYL*, is not dispositive. *See, e.g., Classics Chicago, Inc. v. Comptroller of the Treasury*, 189 Md. App. 695, 714, 985 A.2d 593, 604 (2010) ("The Court of Appeals [in *SYL*] did not adopt a 'two prong sham transaction' test but consistent with the trend in caselaw, looked to the economic substance, in terms of the practical effect of the transactions in question. While relevant, the motivation behind the transactions is not necessarily dispositive."). Thus, Petitioners' first attempt at distinguishing *SYL* is unavailing.

Secondly, we do not disclaim that the subsidiaries here engaged in more substantive activities than those in *SYL*. In particular, the record indicates that GEH acquired patents from third parties, licensed patents to third parties, and paid substantial fees for outside legal counsel and other services. But although GEH and FVI have more "window dressing" than the *SYL* subsidiaries, these additional trappings do not imbue GEH and FVI with substance **as separate entities.** *See SYL*, 375 Md. at 106, 825 A.2d at 415 ("SYL and Crown Delaware had a touch of "window dressing" designed to create an illusion of substance."). Indeed, Gore permeates the substantive activities of both GEH and FVI. Petitioners' employees and operations are so intertwined with Gore as to be almost inseparable, as the "Legal Services Consulting Agreement," and reliance on Gore—for everything from professional services,

25

to things like office space—so indicate.

For instance, the much ballyhooed third-party licensing agreements were found by the Tax Court to suggest "that the patent committee of GEH strongly considers the interest of W. L. Gore in making its decisions."[16] GEH's patent acquisition, although not specifically addressed on by the Tax Court, is subject to the same charge.[17] Although GEH produced

[16] In support of this finding, the then-President of GEH, Ian Campbell, testified that a company purchasing product from Gore might have infringed GEH patents had they not also received a license from GEH. In such instance, the license agreement would ultimately accommodate Gore's business.

Mr. Campbell described the decision-making dynamic concerning third-party licensing as follows:

> Gore, Inc. is the largest licensee of Gore Enterprise Holdings. Gore, Inc. is the parent of Gore Enterprise Holdings. Obviously these relationships create – make it necessary for Gore Enterprise Holdings to take into consideration what it, Gore Enterprise Holdings believes is in the best interest of Gore, Inc. in making whatever decisions it makes with respect to the patent portfolio. But these are independent decisions.

From the conflicting (and at times, contradictory) evidence presented, the Tax Court inferred a finding of interdependence, not independence as a separate business entity. Under the applicable standard of review, those inferences are for the Tax Court to make, and we will not disturb them. *See supra*. Additionally, we observe that GEH's refusal to do something that was not in Gore's best interest is hardly evidence of independence.

[17] Ian Campbell described GEH's independent activity in patent acquisition as follows:

> There has been a number of occasions where business leaders at Gore, Inc. have requested that Gore Enterprise Holdings acquire patents from third parties. Where Gore Enterprise Holdings has, during the course of due diligence, discovered that there were some flaws, sometimes some fatal flaws with the patents that

(continued...)

26

some evidence of outside counsel fees and other expenses, the record lacks specificity and

comprehensiveness concerning the nature and scope of these charges.[18]  The Tax Court's

failure to address certain aspects of this third-party activity, or to address it with pain-staking

particularity, does not trouble us, as the record materials that Petitioners have brought to our

[17](...continued)
> while the technology might be very interesting for Gore, Inc. to acquire the justification for acquiring it had to be based on the technology and not any patent protection.

Mr. Campbell also described a series of patent acquisitions during his testimony.  For example, he indicated that GEH began to look at acquiring patents from third parties when GEH learned that Gore would be entering the stent graft business.  He stated that "there was a strong feeling at [GEH]'s level that we needed to get more patents that we would be able to use [w]ere [Gore,] Inc. to be faced with litigation from the large medical companies."

According to Campbell, GEH also purchased a patent "related to some of [Gore's] industrial products, some vacuum collection, some Gore, Inc.'s vacuum technology and so Gore Holdings acquired this patent to increase the scope of protection it had in that area."

Mr. Campbell then cited an example where GEH looked at a patent portfolio that Gore's medical business team wished to acquire.  GEH evaluated the proposed transaction and told the Gore team that GEH was not prepared to pay the contemplated amount of money for those patents.

Campbell also described at least one instance where GEH "thought that [a particular patent acquisition] would be an additional part of our portfolio, whether Gore, Inc. used it or whether it might be available for license to others."  In this isolated case, GEH's decision did not appear to implicate Gore interests, at least not facially.  Nevertheless, the totality of the evidence about third-party patents suggests that GEH's patent acquisition activity implicated Gore interests in much the same way as its third-party licensing activity.

[18]Petitioners' exhibits show payments to outside counsel for fiscal years 1999 and 2000.  A similar document exists for FY 2001, but does not indicate outside counsel fees for that year.  For the rest of the time period in question, outside counsel fees are not indicated on the GEH expense reports.

attention are not enough to undermine the other evidence that the Tax Court properly relied on.

Finally, the fact that various transactions between Gore and its subsidiaries were at arm's length does not dispel the inescapable conclusion that GEH and FVI did not have economic substance as separate business entities. The Tax Court found more convincing the evidence of the subsidiaries' structure and overall dependence,[19] described above, on the parent, and we concur.

With our examination of *SYL* complete, we now move to Petitioners' peripheral arguments.[20] Petitioners' first peripheral argument is that the Comptroller has usurped the

[19]As stated above, while an economist for the Petitioners testified that "the 7.5 royalty rate set in the W. L. Gore GEH License Agreement was reasonable and equivalent to an independent third party rate," he nevertheless "agreed that W. L. Gore and GEH had globally integrated goals and that a synergy existed between W. L. Gore and GEH due to the relationship between patents and products."

[20]*Walden v. Fiore*, 134 S. Ct. 1115 (2014) cited by Petitioners in their "Notice of Supplemental Authority," filed March 4, 2014, is inapposite. *Walden* concerns Nevada's ability to exercise personal jurisdiction over a Georgia defendant in a Bivens-type action for damages. *See Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388, 91 S. Ct. 1999 (1971). In *Walden*, a Georgia police officer was working as a deputized Drug Enforcement Administration agent at a Georgia airport when he conducted a search and seized a large amount of cash from two travelers en route to Nevada, where they lived. Slip Op. at 1–2. The officer later helped draft an affidavit concerning probable cause for the seizure, which was forwarded to the United States Attorney's Office in Georgia. *Id*. at 2-3. The plaintiffs characterized this affidavit as false and misleading. *Id*. The United States Supreme Court held that the Federal District Court in Nevada lacked personal jurisdiction over the defendant police officer, concluding that the officer did not share the requisite "minimal contacts" with Nevada. *Id*. at 11. In particular, the Court highlighted its consistent rejection of "attempts to satisfy the defendant-focused 'minimum contacts' inquiry by demonstrating contacts between the plaintiff (or third parties) and the forum state." *Id*. at 6.

(continued...)

28

legislative function by transforming Maryland from a separate reporting to a Combined/Unitary Reporting state.[21] This argument's rationale is that because neither GEH and FVI have the requisite connection with Maryland to be taxed as independent entities, the Tax Court treated them as a unitary business, running afoul of the separate reporting requirement. Relatedly, Petitioners claim that the Comptroller has improperly aggregated Gore and its subsidiaries as unitary for purposes of creating nexus, but then treated them as independent entities that are required to file separate returns under the statute. Petitioners argue that under the Tax Court's ruling, any entity that is part of a unitary business with a Maryland parent is within the Comptroller's reach. Moreover, Petitioners warn that because the Comptroller is relying on unitariness to establish nexus, taxpayers cannot now look to their own status, but must look at the status of the unitary parent to assess their own tax liability.

These arguments are unavailing. As we explained, under *SYL*, the unitary business principle cannot be used to establish nexus over GEH and FVI. Both of these entities are being taxed according to the separate reporting requirements of Maryland. In this case,

---

[20](...continued)

We are not persuaded by this authority, which concerns the basis for exercising personal jurisdiction in a decidedly different context. Our decision rests on jurisdictional precepts in the corpus of tax law that have either been affirmed or undisturbed by the Supreme Court. Petitioners' reliance on *Walden* is misplaced.

[21]Md. Code (1988, 2010 Repl. Vol.), § 10-811 of the Tax-General Article ("Each member of an affiliated group of corporations shall file a separate income tax return."). This statutory scheme for filing income tax returns is known as "separate reporting."

29

nexus has been satisfied, under *SYL*, by the entities' lack of economic substance as separate business entities. Another way of viewing the *SYL* standard is the recognition that the parent's activity is what generates the subsidiary's income.[22] *See Classics Chicago*, 189 Md. App. at 715–16, 985 A.2d at 605 ("As can be readily seen, the basis of a nexus sufficient to justify taxation, in [*SYL* and other cases], was the economic reality of the fact that the parent's business in the taxing state was what produced the income of the subsidiary."). This does not mean, however, that the income is not that of the subsidiary, who as a Maryland-taxable entity, is subject to report it under the separate reporting features of the State. Because the unitary business principle cannot be invoked to support the constitutional taxation of GEH and FVI as individual entities, there is no inconsistency in the Tax Court's finding of nexus under *SYL*, and Maryland's requirement of separate reporting.

Petitioners' second peripheral argument is that the Tax Court's ruling represents an improper disregard for the corporate form under Maryland law. Petitioners invoke Maryland's long-settled precedent that "'[t]he corporate entity will be disregarded only when necessary to prevent fraud or to enforce a paramount equity.'" *Stein v. Smith*, 358 Md. 670, 682, 751 A.2d 504, 510 (2000) (quoting *Bart Arconti & Sons, Inc. v. Ames-Ennis, Inc.*, 275 Md. 295, 312, 340 A.2d 225, 235 (1975)). Indeed, this precept has strong weight in our case law:

---

[22]We stop short of endorsing this alternative view as equivalent to our inquiry under *SYL*.

30

> Maryland courts accord the corporate entity an extraordinary measure of deference, apparently relaxed only in instances of proven common law fraud. The rule in Maryland is that the corporate form 'will be disregarded only when necessary to prevent fraud or to enforce a paramount equity.' [*Dixon v. Process Corp.*, 38 Md. App. 644, 654, 382 A.2d 893, 899 (1978).] In practice, however, the courts simply have not found an equitable interest more important than the state's interest in limited shareholder liability.

G. Michael Epperson and Joan M. Canny, Survey, *The Capital Shareholder's Ultimate Calamity: Pierced Corporate Veils and Shareholder Liability in the District of Columbia, Maryland, and Virginia*, 37 Cath. U. L. Rev. 605, 621 (1988) (footnotes omitted).

Invoking this doctrine, Petitioners contend that it was improper for the Tax Court to hold that GEH and FVI are inextricably connected with Gore. It avers that the related conclusion—that GEH and FVI do business in Maryland because Gore does—is incorrect and runs afoul of Maryland's doctrine respecting the corporate form.

Petitioners appear to be foisting a limiting principle on this Court—namely, that in a tax case, we cannot look to the realities of the relationship between a parent and subsidiary in order to determine the amount of income that is fairly traceable to Maryland. This principle would seemingly require an outright rejection of *SYL*. This we shall not do. Petitioners point to no authority that rejects *SYL*'s analytical tool of evaluating economic substance as a separate business entity in order to justify taxation.

Nor does *SYL*, in our opinion, compel a disregard of the unique corporate existence of either the parent or subsidiary. Indeed, the Comptroller is taxing GEH and FVI

31

independently, subject to the separate reporting requirements of the State of Maryland. The corporate form doctrine upon which Petitioners rely seems wholly irrelevant to the tax questions at issue here. Indeed, Petitioners direct us to only one case that addresses veil-piercing or corporate form in the context of taxation, and that case explicitly recognized the potential for tax mischief posed by subsidiaries. *See Moline Properties, Inc. v. Comm'r of Internal Revenue*, 319 U.S. 436, 439, 63 S. Ct. 1132, 1134 (1943) (holding that "the necessity of striking down frauds on the tax statute" may require disregarding the corporate form) (citations omitted). The other cases are so far afield as to be considered inapposite. *See Serio v. Baystate Properties, LLC*, 209 Md. App. 545, 60 A.3d 475 (2013) (declining to pierce the corporate veil in a breach of contract suit involving construction contractors seeking amounts due); *Ramlall v. MobilePro Corp.*, 202 Md. App. 20, 30 A.3d 1003 (2011) (declining to pierce the corporate veil in a breach of contract seeking compensation for services performed).

Petitioners' third peripheral argument is that the Tax Court's use of *SYL* improperly transforms the scope of federal patent rights in violation of federal law. This argument attacks the statement by the Court of Special Appeals that a patent is "used" whenever a licensee manufactures or sells a product covered by that patent. *See Gore Enterprise Holdings*, 209 Md. App. at 538–39, 60 A.3d at 116. The logic behind a patent being "used" is also reflected in *SYL*, where we cited with approval *Geoffrey, Inc. v. South Carolina Tax Comm'n*. 375 Md. at 108, 825 A.2d at 416 (citing *Geoffrey*, 313 S.C. 15, 19–20, 437 S.E.2d

32

13, 16 (1993)). In *Geoffrey*, the South Carolina Supreme Court approved the taxation of a

Toys R Us subsidiary that held trademarks used by the parent in South Carolina. *SYL*, 375

Md. at 108, 823 A.2d at 416. The *Geoffrey* Court supported taxation with the following

reasoning:

> Geoffrey has not been unwillingly brought into contact with
> South Carolina through the unilateral activity of an independent
> party. Geoffrey's business is the ownership, licensing, and
> management of trademarks, trade names, and franchises. By
> electing to license its trademarks and trade names for use by
> Toys R Us in many states, Geoffrey contemplated and
> purposefully sought the benefit of economic contact with those
> states. Geoffrey has been aware of, consented to, and benefitted
> from Toys R Us's use of Geoffrey's intangibles in South
> Carolina. Moreover, Geoffrey had the ability to control its
> contact with South Carolina by prohibiting the use of its
> intangibles here as it did with other states. We reject Geoffrey's
> claim that it has not purposefully directed its activities toward
> South Carolina's economic forum and hold that by licensing
> intangibles for use in South Carolina and receiving income in
> exchange for their use, Geoffrey has the "minimum connection"
> with this State that is required by due process.
>
> In addition to our finding that Geoffrey purposefully directed its
> activities toward South Carolina, we find that the "minimum
> connection" required by due process also is satisfied by the
> presence of Geoffrey's intangible property in this State.

*Geoffrey*, 313 S.C. at 19–20, 437 S.E.2d at 16 (1993) (citations omitted). The *Geoffrey* Court

concluded that "by licensing intangibles for use in this State and deriving income from their

use here, Geoffrey has a 'substantial nexus' with South Carolina." *Geoffrey*, 313 S.C. at

23–24, 437 S.E.2d at 18.

According to Petitioners, relying on the "use" of patents to establish nexus is contrary

33

to federal law. They argue that a patent only confers a negative right—the right to exclude, and does not confer anything bordering a positive right—*i.e.*, a right to do, make, or use something. *See Dawson Chem. Co. v. Rohm & Haas Co.*, 448 U.S. 176, 215, 100 S. Ct. 2601, 2623 (1980) ("[T]he essence of a patent grant is the right to exclude others from profiting by the patented invention."). The core of this argument is that when Gore sells materials in Maryland covered by patents held by GEH, these sales in no way implicate, in any physical sense, GEH's patents. This is so, Petitioners allege, because all that patent licenses confer is a promise not to sue. Essentially, the argument alleges that a patent is completely severable—both in a functional and metaphysical sense—from the sale of its covered product.

Petitioners contrast these characteristics with those of trademarks, the intellectual property upon which the *Geoffrey* Court found nexus. Petitioners claim that trademarks are inseparable from their covered product because trademarks guarantee product quality and provenance. *See Visa, U.S.A., Inc. v. Birmingham Trust Nat. Bank*, 696 F.2d 1371, 1375 (Fed. Cir. 1982) ("Unlike patents or copyrights, trademarks are not separate property rights. They are integral and inseparable elements of the goodwill of the business or services to which they pertain."). Consequently, a trademark owner who licenses a trademark must police the quality and character of the products sold under that mark. According to Petitioners, this requires contact with the forum state that a patent license simply does not.

We are not convinced that the inherent nature of patents precludes their "use" by Gore

34

for purposes of supporting taxation. As Respondent correctly points out, the language of the exclusive license agreement between Gore and GEH allows Gore to "make, use and sell any patented inventions under all U.S. patents" owned by GEH. The fair implication of this language is that Gore "uses" GEH patents. Moreover, the royalties generated from the creation, use and sale of items covered by the license agreement comprise the lion's share of GEH's income.

Nor are we persuaded that the distinction between patents and trademarks is a distinction with a difference when it comes to taxation. Most significantly, in *SYL*, we did not hold that the distinction between patents and trademarks made a difference when we examined Crown Delaware, a subsidiary that managed a portfolio of both trademarks **and patents**. *See supra*. As the Court of Special Appeals instructively stated:

> [T]he fact that these two types of intellectual property have different origins in federal law does not affect *how* or *where* they are "used" for purposes of state income taxation. . . . Nor are we persuaded by GEH's characterization of a patent as a uniquely "negative" right that allows its owner "to prevent others from making, using, or selling" a product; trademarks operate in precisely the same manner, by *preventing* others from using a given mark. *See College Sav. Bank v. Fla. Prepaid Postsecondary Ed. Expense Bd.*, 527 U.S. 666, 673, 119 S. Ct. 2219, 144 L.Ed.2d 605 (1999) ("The hallmark of a protected property interest is the right to exclude others.").

*Gore Enterprise Holdings*, 209 Md. App. at 539–40, 60 A.3d at 116. (Italics in original).

## II. The Comptroller's Apportionment Formula

Petitioners also contest the Comptroller's application of Gore's apportionment factor

to GEH and FVI's income in order to calculate the subsidiaries' tax obligations. First, Petitioners claim that the use of this formula was prohibited by a binding regulation that the Comptroller ignored. Petitioners also contend that the Comptroller violated the Due Process and Commerce Clauses of the Constitution by applying an apportionment formula that was fundamentally unfair. We will address each argument in turn.

Petitioners' first argument concerns the interplay of Md. Code Ann. (1988, 2010 Repl. Vol.), § 10-402(a) of the Tax-General Article ("TG") and Code of Maryland Regulations ("COMAR") 03.04.03.08(C)(3)(d). TG § 10-402(a)(2) reads:

> (2) if a corporation carries on its trade or business in and out of the State, the corporation shall allocate to the State the part of the corporation's Maryland modified income that is derived from or reasonably attributable to the part of its trade or business carried on in the State, in the manner required in subsection (b), (c), or (d) of this section.

Petitioners argue that COMAR 03.04.03.08(C)(3)(d) requires that a taxpayer earning income from intangibles be apportioned according to a two-factor payroll and property formula. Petitioners claim that the Comptroller ignored this regulation, and instead improperly borrowed an apportionment formula from Gore that included Gore's property, payroll, and sales figures.[23]

Based solely on the language of the statute and regulation, we reject Petitioners' argument that the Comptroller ignored a binding regulation. Both TG § 10-402 and COMAR

---

[23] COMAR 03.04.03.08(C) and its subdivision COMAR 03.04.93.08(C)(3)(d) both reference a "Three-Factor Formula," not a two-factor formula.

36

03.04.03.08 are provisions with exceptions. TG § 10-402(d) allows the Comptroller to "alter,

if circumstances warrant, the methods under subsections (b) and (c) of this section[.]"

COMAR 03.04.03.08(F)(1) allows the Comptroller to alter both a formula or its components

where an apportionment formula "does not fairly represent the extent of a corporation's

activity in [the] State[.]" As Respondent correctly points out, the three-factor formula set

forth by TG § 10-402(a)(2) and COMAR 03.04.03.08(C) would have yielded an

apportionment factor of zero, which did not fairly represent the subsidiaries' activity in

Maryland. Thus, a plain reading of either the statute or regulation empowers the Comptroller

to do precisely that to which Petitioners object.

Petitioners' second argument attacks the fairness of the apportionment formula used

by the Comptroller. Specifically, Petitioners allege that the Comptroller's formula ignored

the limiting principle of taxing only "an apportionable share of the multistate business carried

on in part in the taxing State." *See Allied-Signal*, 504 U.S. at 778, 112 S. Ct. at 2258. The

core of Petitioners' argument is that because neither GEH nor FVI have property or payroll

in Maryland, no taxes are due in Maryland, and any apportionment that generates Maryland

tax liability is unfair.

Concerning the Comptroller's apportionment formula, the Tax Court reasoned:

> The tax calculation utilized by the Comptroller was intended to
> apportion to Maryland only the Delaware Holding Company
> income connected to the operating transactions of W. L. Gore.
> Expenses were deducted from the income if the Delaware
> Holding Company made an affirmative demonstration that the
> expenses were directly related to the income. GEH made no

37

attempt to allocate Delaware Holding Company expenses to the W. L. Gore connected income. Consequently, GEH's tax liability was calculated by multiplying royalties paid by W. L. Gore times the W. L. Gore apportionment formula. For FVI, the tax is calculated by multiplying interest paid by W. L. Gore times the W. L. Gore apportionment formula. There was no other evidence offered by the Petitioners that this formula method was unfair.

The Comptroller's use of an apportionment formula is authorized by the unitary business principle, described by the United States Supreme Court as follows:

> The unitary business/formula apportionment method is a very different approach to the problem of taxing businesses operating in more than one jurisdiction. It rejects geographical or transactional accounting, and instead calculates the local tax base by first defining the scope of the "unitary business" of which the taxed enterprise's activities in the taxing jurisdiction form one part, and then apportioning the total income of that "unitary business" between the taxing jurisdiction and the rest of the world on the basis of a formula taking into account objective measures of the corporation's activities within and without the jurisdiction. This Court long ago upheld the constitutionality of the unitary business/formula apportionment method, although subject to certain constraints.

*Container Corp.*, 463 U.S. at 165, 103 S. Ct. at 2940.

The constraints on the unitary business principle are posed by the Due Process and Commerce Clauses, which require: (1) showing the existence of a unitary business, "part of which is carried on in the taxing state[,]" and (2) demonstrating "'a rational relationship between the taxing State and the intrastate values of the taxpayer's enterprise[.]'" *NCR Corp.*, 313 Md. at 132, 544 A.2d at 770–71 (quoting *Xerox*, 290 Md. at 145, 428 A.2d at 1218–19).

38

A unitary business features functional integration, centralized management, and economies of scale.[24] The test under the Constitution is "not the *potential* of unitary control, but rather the actual, in fact unitariness or separateness of the subsidiary enterprises." *Hercules*, 351 Md. at 112, 716 A.2d at 281 (citing *F. W. Woolworth Co. v. Taxation & Revenue Dep't of State of N.M.*, 458 U.S. 354, 362, 102 S. Ct. 3128, 3134 (1982)). The Tax Court found that GEH and FVI demonstrated integration of business functions and personnel, centralized management through the inclusion of Gore employees on the subsidiaries' boards, and a reliance on Gore for everything from furniture to legal services. These findings were well supported by the record. Based on these findings, the Tax Court did not err in concluding that Gore, GEH, and FVI were engaged in a unitary business.[25] *Cf. Hercules*, 351 Md. at 112, 716 A.2d at 281 (declining to find a unitary business where the subsidiary's day-to-day operations were "relatively autonomous," the subsidiary had its own business divisions, subsidiary employees had no "'bridge' back to the parent company," and no employee or officer of the subsidiary was simultaneously an employee or officer of the parent).

Having been found a unitary business, Petitioners now "bear[] the burden of

---

[24]*See supra*.

[25]We observe that the appropriate standard of review for determination of a unitary business is "whether a reasoning mind, having a proper understanding of the relevant law, could have reached the conclusion reached by the Tax Court." *Supervisor of Assessments of Montgomery Cnty. v. Asbury Methodist Home, Inc.*, 313 Md. 614, 628, 547 A.2d 190, 196–97 (1988).

demonstrating that the income [they] seek[] to exclude from taxation was derived from unrelated business activity that constituted a discreet business enterprise." *NCR Corp.*, 313 Md. at 132, 544 A.2d at 771.

Our review of apportionment schemes is guided by the Supreme Court's analysis in *Container Corp*:

> Having determined that a certain set of activities constitute a "unitary business," a State must then apply a formula apportioning the income of that business within and without the State. Such an apportionment formula must, under both the Due Process and Commerce Clauses, be fair. The first, and again obvious, component of fairness in an apportionment formula is what might be called internal consistency—that is, the formula must be such that, if applied by every jurisdiction, it would result in no more than all of the unitary business's income being taxed. The second and more difficult requirement is what might be called external consistency—the factor or factors used in the apportionment formula must actually reflect a reasonable sense of how income is generated. The Constitution does not "invalidat[e] an apportionment formula whenever it *may* result in taxation of some income that did not have its source in the taxing State . . . ." *Moorman Mfg. Co.*, 437 U.S. at 272, 98 S. Ct. at 2344 (emphasis added). Nevertheless, we will strike down the application of an apportionment formula if the taxpayer can prove "by 'clear and cogent evidence' that the income attributed to the State is in fact 'out of all appropriate proportions to the business transacted in that State,' or has 'led to a grossly distorted result[.]'" *Moorman Mfg. Co.*, 437 U.S. at 274, 98 S. Ct. at 2345.

463 U.S. at 169–70, 103 S. Ct. at 2942 (citations omitted) (ellipsis in original).

We agree with the Court of Special Appeals that "[t]here is no dispute that, if applied by every jurisdiction, the Comptroller's apportionment is internally consistent and 'would

result in no more than all of the unitary business' income being taxed.'" *Gore Enterprise*

*Holdings*, 209 Md. App. at 543, 60 A.3d at 119 (quoting *Container Corp.*, 463 U.S. at 169,

103 S. Ct. at 2933). Petitioners do not dispute internal consistency in their brief, and we find

no reason to depart from the intermediate court's holding of internal consistency.

Regarding external consistency, Petitioners argue that the Comptroller's

apportionment formula is unfair and out of proportion to the business that GEH and FVI

conducted in Maryland. Essentially, Petitioners claim that they are being punished for Gore's

manufacturing in Maryland. This is not so. The Comptroller's apportionment formula

captured Gore's expenses in Maryland—expenses that simultaneously constituted income

for GEH and FVI. Thus, the formula reflects "a reasonable sense of how [GEH and FVI's]

income is generated." *See Container Corp.*, 463 U.S. at 169, 103 S. Ct. at 2942. GEH and

FVI bear the burden of demonstrating that the Comptroller's apportionment formula distorts

the proportion of their income traceable to Maryland. For all the reasons discussed above,

Petitioners have failed to meet this burden.[26]

In conclusion, the Tax Court did not err in holding that the Comptroller had the

authority to tax GEH and FVI. GEH and FVI are subsidiaries with "no economic substance

as separate business entities" from their parent, Gore. Therefore, these subsidiaries are

taxable entities under *SYL*. We also conclude that the Tax Court did not err in upholding the

apportionment formula used by the Comptroller. This apportionment formula passes

---

[26]*See supra*.

41

constitutional muster through a justified application of the unitary business principle.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; COSTS TO BE PAID BY PETITIONERS.**