NORMAN L. PRITCHETT, Clerk *v.* IDA
MAY KIDWELL et al.

[No. 1502, September Term, 1982.]

* * *

PRINCE GEORGE'S COUNTY *v.* IDA MAY
KIDWELL et al.

[No. 1518, September Term, 1982.]

*Decided June 15, 1983.*

The causes were argued before GILBERT, C. J., and WILNER and GETTY, JJ.

*Catherine M. Shultz, Assistant Attorney General,* with whom was *Stephen H. Sachs, Attorney General,* on the brief, for appellant Pritchett. *Frederick J. Wieker, Associate County Attorney for Prince George's County,* with whom were *Robert B. Ostrom, County Attorney for Prince George's County,* and *Barbara L. Holtz, Deputy County Attorney for Prince George's County,* on the brief, for appellant Prince George's County.

*Hervey G. Machen* for appellees.

WILNER, J., delivered the opinion of the Court.

The State of Maryland imposes two separate taxes on the transfer of real property. One is a transfer tax imposed directly upon the instrument conveying title (Md. Code Ann. art. 81, § 278A); the other is a recordation tax imposed upon the privilege of recording such an instrument (art. 81, § 277). In addition to the State tax, Prince George's County imposes a local transfer tax upon instruments conveying title to real property. *See* Pr. Geo. Co. Code, §§ 10-187, 10-188. This appeal involves the application of these three taxes.

### (1) *Background*

The dispute, which pits the State and the county against Ida May Kidwell and Ann Tsourounis, arises from certain transactions between Kidwell and Tsourounis, on the one hand, and T. C. and Leona Busby, on the other.

The Busbys owned a tract of land in Prince George's County upon which they desired to build a restaurant. In furtherance of that goal, in October, 1978, the Busbys entered into a partnership arrangement with Kidwell and Tsourounis. On October 3, 1978, the Busbys conveyed to

Kidwell and Tsourounis, as tenants in common, an undivided one-fourth interest in the land for a consideration of $43,300. That same day, the four parties borrowed $550,000 from Suburban Trust Co. in order to finance construction of the restaurant. They each cosigned a promissory note in that amount and a deed of trust pledging the property as security for the note, agreeing to be jointly and severally bound on the obligation. Kidwell's and Tsourounis's respective husbands also signed the note as joint and several guarantors.

On October 10, 1978, a formal partnership agreement was signed by the four principals. The capital of the partnership was to be "such sums as are deemed necessary for carrying on the partnership business," but, as of October 10, it was stated to be $43,334 plus the land. The agreement (¶ 4) went on to recite that the Busbys had a three-fourths interest in the lot, that Kidwell and Tsourounis had an undivided one-fourth interest in it, that "it is agreed by the parties that they hold the lot for the partnership," and that it is agreed that the Busbys "contributed 75% of the capital" and Kidwell and Tsourounis "contributed 25% of the capital." Profits and losses were to be shared in the same proportions — 75% to the Busbys, 12½% each to Kidwell and Tsourounis.

The agreement further provided that, upon dissolution or termination of the partnership, any of the partners had the right to purchase the share(s) of the retiring partner(s)

> "for a sum of money equal to his share of the total value of the property and assets of the partnership, as the said values shall be entered and recorded upon the books of the firm, plus his share . . . of the value of the good will of the partnership. . . ."

The object of the partnership was not to operate the restaurant directly but to lease it to others who would operate it. With the proceeds of the loan from Suburban Trust Co., the partners built the facility and leased it to a corporation. The lease is not in the record before us, but we are told that

the intent was for the lease to provide sufficient rent to amortize the loan and provide a profitable return to the partners.

Things did not go as expected. The partners were required to advance additional funds and Kidwell and Tsourounis had to prevail upon Suburban Trust Co. to defer the required payments of principal on the loan. Finally, by the fall of 1980, in order to avert a total disaster, the parties agreed that Kidwell and Tsourounis would buy out the Busbys and then attempt to dispose of the property in an orderly fashion.

Thus it was that on October 14, 1980, the parties entered into a Dissolution and Termination Agreement. The Agreement, in its "Whereas" clauses, recited that Kidwell and Tsourounis had agreed to pay $60,000 to the Busbys "for all their right, title and interest to partnership assets" and that

> "in consideration of the [Busbys] assigning all of their interest to partnership assets to [Kidwell and Tsourounis] and [a]greeing that the partnership will be terminated effective with the execution of this agreement, [Kidwell and Tsourounis] agree to save harmless the [Busbys] from any financial responsibilities on a joint and several promissory note dated October 3, 1978, signed by all the partners . . . jointly and severally. . . ." [1]

The two operative paragraphs of the Agreement implemented those intentions. In the first of these, in consideration of $60,000 the Busbys (1) assigned to Kidwell and Tsourounis all of their right, title, and interest in the assets of the partnership, including "any interest in and to capital reflected on the [partnership] books," and (2) authorized Kidwell and Tsourounis to terminate the business as a partnership. In the second paragraph, "[i]n consideration of the

---

1. The Agreement also recited that, although title to the land was held individually by the Busbys (three-fourths) and Kidwell and Tsourounis (one-fourth), "the said parties held bare legal title for the partnership" and that the proceeds of the note were used to construct and furnish a restaurant building on the lot.

mutual covenants herein contained and the execution of a deed conveying to [Kidwell and Tsourounis] all of the interest of the [Busbys] in [the land] and improvements and all other interest in the assets of the [partnership]," Kidwell and Tsourounis "agree[d] to save harmless [the Busbys] from any further obligations on the note of the partnership to the Suburban Trust Company in the amount of $550,000 and any other obligation of said partnership *and specifically any obligation to Kidwell and Tsourounis partner. . . .*" (Emphasis supplied.) The emphasized language was added by interlineation.

Also on October 14, the Busbys, in further implementation of the Dissolution and Termination Agreement, executed a deed for their three-fourths interest in the land and improvements to Kidwell and Tsourounis. The deed recited the consideration as $60,000. In an affidavit attached to the deed, however, the Busbys certified that the property was subject to a $550,000 deed of trust, that they held title to their three-fourths interest in the property "as trustees for the partnership," and that

> "in consideration of the sum of $60,000.00 your affiants agreed to dis[s]olve and terminate the partnership by conveyance of the assets of the aforesaid partnership to parties of the second part in consideration of the said parties of the second part assumming *[sic]* all obligations of the partnership with its dis[s]olution, termination, and distribution of its assets."

This deed is what sparked the instant controversy. Kidwell and Tsourounis reckoned the consideration, upon which the recordation tax and the two transfer taxes were based, to be $60,000, and thus proposed to pay a recordation tax ($2.20/$500) of $264, a State transfer tax (0.5%) of $300, and a county transfer tax (1%) of $600. The clerk of the Circuit Court for Prince George's County saw the matter quite differently. He counted as consideration not just the $60,000 paid in cash but also three-fourths of the $550,000

note *(i.e.,* $412,500) assumed by the buyers. That produced an additional recordation tax of $1,813 ($2.20/$500 on $412,500), an additional State transfer tax of $2,062.50 (0.5% x $412,500), and an additional county transfer tax of $4,125 (1% x $412,500). Kidwell and Tsourounis paid the additional taxes in order to get the deed recorded and then promptly applied for a refund.

When the claim for refund was denied, they appealed to the Maryland Tax Court which, on September 28, 1981, found in their favor. The Tax Court concluded that, because Kidwell and Tsourounis "were already jointly and severally liable on the Deed of Trust and because the filing which created this controversy contains no change in the liability of the original parties," there was "no advantage or benefit" flowing from the indemnity, and for that reason the indemnity did not constitute consideration subject to taxation.

Aggrieved by the Tax Court's order to refund the taxes imposed on the $412,500, the State, with respect to its transfer tax ($2,062.50), and the county, with respect to the recordation tax [2] and its transfer tax ($5,938), appealed to the Circuit Court for Prince George's County. By written order dated August 31, 1982, that court, on the theory that "one cannot 'assume' a debt which one is already obligated to pay," affirmed the Tax Court decision. The State and the county, still aggrieved, bring their complaint to us.

## (2) *Discussion*

All three taxes are calculated upon "the actual consideration paid or to be paid." *See* Md. Code Ann. art. 81, § 277 (q) and (r) and Pr. Geo. Co. Code, § 10-192 with respect to the recordation tax,[3] art. 81, § 278A (b) (1) with

---

**2.** Md. Code Ann. art. 81, § 277 (r) provides that the recordation tax on instruments recorded in Prince George's County "shall be paid to and collected by the director of the office of finance of Prince George's County."

**3.** Section 277 (r) imposes a tax of $1.65/$500 "of the actual consideration paid or to be paid" on instruments recorded in Prince George's County. Subsection (q), however, permits the county, by ordinance, to impose a different rate. By § 10-192 of its local code, Prince George's County has done so; it has, as noted, set the rate at $2.20/$500.

respect to the State transfer tax, and Pr. Geo. Co. Code, § 10-188 (a) with respect to the county transfer tax. That, then, is the relevant standard — the actual consideration paid or to be paid.

The Attorney General, as legal advisor to the clerks of court, has consistently taken the position that when property is conveyed subject to a mortgage or deed of trust, whether or not the buyer "assumes" the obligation, the "consideration paid or to be paid" includes the amount of the outstanding debt. *See, for example,* 22 Op. Att'y Gen. 799 (1937); 42 Op. Att'y Gen. 372 (1957); 60 Op. Att'y Gen. 671 (1975). The rationale for that approach, as expressed first in the 1937 opinion, is that, in imposing the tax on "consideration paid or to be paid," the Legislature "had in mind the total amounts paid to obtain an unencumbered title to the property" and that, in the case of an existing mortgage, "future payments on the mortgage are a part of the consideration to be paid, for which the purchaser is obligated."

The same approach was taken by the Florida Supreme Court in *Kendall House Apts., Inc. v. Department of Revenue,* 245 So.2d 221 (Fla.), *cert. den.* 404 U.S. 832 (1971). The conveyance there was subject to an outstanding mortgage which was *not* assumed by the buyer, and yet the mortgage balance was held to be "consideration" subject to the State recordation tax. Acknowledging that the buyer was thus assuming no personal liability on the mortgage, the Court nonetheless noted, at p. 223 (of 245 So.2d):

"It is an economic fact that persons who acquire property 'subject to' a mortgage normally pay the indebtedness represented by the mortgage in order to prevent the loss of the property to the same extent as those persons acquiring property 'assuming and agreeing to pay' the mortgage.

In the instant case, the concept of 'consideration' as used in [the Florida tax statute] is clearly satisfied. The [agreement] contemplates a transfer of the burden of making the mortgage payments to

the grantee as of the date of closing and a corresponding benefit derived by the grantor who agreed to make mortgage payments only up until the time of closing. . . ."

We have essentially the same "economic fact" here. *Vis a vis* the *bank,* the respective obligations of the parties remained unchanged; all four continued to be jointly and severally liable on the note. The agreement clearly contemplated, however, that from and after October 14, 1980, Kidwell and Tsourounis would make the required payments on the note and relieve the Busbys from any actual (as opposed to legal) responsibility in connection therewith. But for the conveyance the Busbys would have had to contribute, directly or indirectly, three-quarters of all payments made on the note. If the partnership made the payment, as was originally intended, three-quarters of it would have come from their capital or profit interest in the firm; to the extent that the payment was made by the individual partners because of insufficient partnership assets, the Busbys would be expected to contribute the same three-quarter share. Indeed, Kidwell and Tsourounis would have had a legally enforceable right of contribution for that amount. *See Jackson v. Cupples,* 239 Md. 637 (1965); *Fithian v. Jamar,* 286 Md. 161 (1979). The language added by interlineation in the second paragraph of the Dissolution and Termination Agreement, which we quoted above, may well have had special reference to the elimination of that right of contribution.

The indemnity thus had a dual significance to the Busbys. It terminated their liability to Kidwell and Tsourounis for contribution and it gave them full recourse to their former partners in the event they were actually called upon to make payment to the bank. The converse, of course, is true with respect to Kidwell and Tsourounis; they relinquished their right of 75% contribution from the Busbys and acquired, at the same time, a new liability on the indemnity.

As the Florida Court suggested, in determining what is "consideration," or "consideration paid or to be paid," for purposes of assessing transfer or recording taxes, we must

give regard to the reasonable expectations of the parties: tax avoidance ploys aside, what did they consider the bargain to be? Viewed in that light, it is unrealistic to conclude, as the Tax Court and the Circuit Court did, that the indemnity agreement had no value — that it was of no benefit to the Busbys and of no detriment to Kidwell and Tsourounis.

The indemnity was stated in the agreement as being part of the overall consideration for the transfer. The Busbys must reasonably have assumed that Kidwell and Tsourounis would live up to their commitment and pay the note in accordance with its terms or as otherwise permitted by the bank; any such future payments made by them, by relieving the Busbys of the obligation therefor, would thus constitute "consideration . . . to be paid" insofar as the Busbys were concerned. *Compare* art. 81, § 278A (b) (2), applying a different rule with respect to the State transfer tax when the conveyance is between certain family (or former family) members.

Finally, although the agreement certainly contemplated the dissolution of the partnership, the conveyance was clearly a sale from the Busbys to Kidwell and Tsourounis and not merely the pro rata distribution of partnership assets, upon liquidation, to the partners.[4] Accordingly, the transaction would not qualify for the non-taxable status determined by the Attorney General in 62 Op. Att'y Gen. 842 (1977) or 64 Op. Att'y Gen. 286 (1979).

> *Judgments reversed; appellees to pay the costs.*

---

4. We note in that regard (1) that at the time the deed was recorded the partnership, though perhaps "dissolved" by operation of law, had not been terminated and no distribution of any kind had been made to Kidwell and Tsourounis, and (2) there is nothing in the record to show that what the Busbys received was, in fact, their proportionate share of the partnership's net assets.