*Shelter Senior Living IV, LLC v. Baltimore County Maryland, et al.*, No. 1276, September Term 2019, Argued: October 2, 2020.

**TAXATION — PROPERTY TAX — MARYLAND RECORDATION TAX — CALCULATION — RELEVANT CONSIDERATION**

In a transfer of a business through a sale of business assets that includes real property in addition to other kinds of property, the state recordation tax may only be imposed on the consideration exchanged for the real property. The state recordation tax may not be imposed on consideration exchanged for other kinds of assets, such as intangible personal property, which are transferred together with real property.

**TAXATION — PROPERTY TAX — MARYLAND TRANSFER TAX — CALCULATION — RELEVANT CONSIDERATION**

In a transfer of a business through a sale of business assets that includes real property in addition to other kinds of property, the state transfer tax may only be imposed on the consideration exchanged for the real property. The state transfer tax may not be imposed on consideration exchanged for other kinds of assets, such as intangible personal property, which are transferred together with real property.

**TAXATION — PROPERTY TAX — BALTIMORE COUNTY TRANSFER TAX — CALCULATION — RELEVANT CONSIDERATION**

In a transfer of a business through a sale of business assets that includes real property in addition to other kinds of property, Baltimore County's transfer tax may only be imposed on the consideration exchanged for the real property. Baltimore County's transfer tax may not be imposed on consideration exchanged for other kinds of assets, such as intangible personal property, which are transferred together with real property.

**TAXATION — PROPERTY TAX — MONTGOMERY COUNTY TRANSFER TAX — CALCULATION — RELEVANT CONSIDERATION**

In a transfer of a business through a sale of business assets that includes real property in addition to other kinds of property, Montgomery County's transfer tax may only be imposed on the consideration exchanged for the real property. Montgomery County's transfer tax may not be imposed on consideration exchanged for other kinds of assets, such as intangible personal property, which are transferred together with real property.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1276

September Term, 2019

_____

SHELTER SENIOR LIVING IV, LLC,

v.

BALTIMORE COUNTY MARYLAND,
ET AL.

_____

Reed,
Friedman,
Gould,

JJ.

_____

Opinion by Gould, J.

_____

Filed: July 1, 2021

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

The General Assembly has enacted a statute imposing recordation and transfer taxes on the transfer of real property. The General Assembly has also delegated to certain counties—including the two involved here, Montgomery and Baltimore Counties—the authority to impose transfer taxes on the sale of real property. Neither the General Assembly nor the county legislative bodies have, however, imposed a tax on the transfer of intangible property.

This case comes to us in the context of the sale of three senior living facilities. To accomplish the transaction, the sellers conveyed to the buyers the real property where the centers operate, as well as specified items of both tangible and intangible property. In each of the three transactions, the total purchase price was agreed up front in the contracts, and then prior to closing, the parties were required to agree on an allocation of the purchase price across the various asset classes, which they did.

The question before us is whether the consideration attributed to the intangible property may factor into the calculation of the state and county transfer and recordation taxes—both of which are determined as a percentage of the consideration paid. Here, given the difficulty associated with valuing intangible property, the tax collectors concluded that such consideration could not be unbundled from the consideration attributed to the real property. Thus, they calculated the taxes based on the consideration allocated to both the real property and intangible property. Although sellers disagreed with the calculation, to complete the transactions and record the deeds of conveyance, they paid the taxes as required by the taxing authorities, and then pursued their right to request a refund, which

was denied. The Tax Court upheld the denial of the refund, and the Circuit Court of Baltimore County affirmed the Tax Court on the sellers' petitions for judicial review.

We shall reverse. The transfer of intangible property is not taxable under the relevant statutes and county codes. The occasion of a business transaction involving the sale of both real property and intangible property does not permit the tax imposed on the transfer of real property to serve as a Trojan horse for taxing the transfer of intangible property. Accordingly, for the reasons explained below, we disagree with the Tax Court and hold that consideration properly attributable to intangible property is *not* included in the calculation of the recordation and transfer taxes.

## BACKGROUND

In July of 2014, Brightview Rockville, LLC ("Brightview Rockville"), Brightview Towson, LLC ("Brightview Towson"), and Brightview White Marsh, LLC ("Brightview White Marsh") (collectively "Sellers" or the "Brightview LLCs")[1] contracted to sell three senior living facilities located in Montgomery and Baltimore Counties. The buyer of the three facilities was SHP, IV, LLC ("Buyer").

The three transactions were governed by separate contracts. The purchase price for each transaction was broken down into three asset categories: real property, tangible personal property, and intangible personal property. The real property was transferred through deeds, the tangible personal property was transferred through bills of sale, and the intangible personal property was transferred through written assignments.

---

[1] After the Brightview LLCs filed their petitions for judicial review of the Tax Court's decisions, they assigned their claims to Shelter Senior Living IV, LLC ("Shelter").

The purchase prices and allocations across the three asset categories for each of the three transactions were as follows:

|  | Brightview Rockville | Brightview Towson | Brightview White Marsh | Total |
|---|---|---|---|---|
| Real property & improvements | $14,519,800 | $14,486,000 | $11,136,400 | $40,142,200 |
| Tangible personal property | $1,587,643 | $997,127 | $558,809 | $3,143,579 |
| Intangible personal property | $13,392,557 | $16,516,873 | $20,204,791 | $50,114,221 |
| Total | $29,500,000 | $32,000,000 | $31,900,000 | $93,400,000 |

Consistent with the above allocations, the consideration reflected in each of the three deeds was based on the value attributed to the real property and improvements, as follows:

Brightview Rockville: $14,519,800;
Brightview Towson: $14,486,000; and
Brightview White Marsh: $11,136,400.

Sellers presented the deeds to appellees Baltimore County, Montgomery County, and the Clerks of Court for Baltimore County and Montgomery County (collectively, the "Taxing Authorities") for recording. The Taxing Authorities refused to record the deeds based on the consideration stated therein. Instead, they insisted that the transfer and recording taxes needed to be calculated based on the consideration allocated to both the real and intangible property.[2]

---

[2] A separate sales tax is imposed on transfers of tangible personal property at a higher rate. Md. Code Ann., Tax-Gen. §§ 11-102(a), 11-204(a)(2) (1988, 2016 Repl. Vol.). The Taxing Authorities did not attempt to impose transfer or recordation taxes on consideration exchanged for tangible personal property, nor did they argue, either at the Tax Court, the circuit court, or here, that they were entitled to do so.

3

Because Sellers couldn't get the deeds recorded unless they paid the full amount of taxes assessed, they paid the taxes and then filed refund requests with the Directors of Finance for both Baltimore and Montgomery Counties, seeking reimbursement for the recordation and transfer taxes paid on the consideration exchanged for the intangible personal property. The requests for reimbursement were denied, and the Sellers subsequently appealed to the Maryland Tax Court.

The Tax Court bifurcated the proceedings into two phases, described as follows:

> First, there will be a discovery phase and evidentiary hearing on the issue of whether, for the transfer of a senior living community, transfer and recordation taxes may be charged on the value of the intangible assets of the going concern. If the Court finds in favor of [Sellers], there will be a second phase of discovery followed by an evidentiary hearing on the issues of the value of the intangible assets in transactions that are the subjects of this appeal and what refund and interest if any, are owed to [Sellers].

The Tax Court resolved the appeal by denying Sellers' refund request in the first phase, holding that "State law and the relevant county codes permit the State and local tax collectors to impose transfer and recordation tax based on the total amount of consideration paid, including any consideration paid for assets categorized by the buyer or seller as intangible property."

Sellers sought judicial review of the Tax Court's decision in the Circuit Court for Baltimore County.[3] The circuit court affirmed the Tax Court's decision, and Shelter filed a timely notice of appeal.

---

[3] Because there were three sellers, three separate appeals to the Tax Court were filed. The Tax Court, however, adjudicated the three cases in a consolidated manner. When the Tax Court ruled against them, Brightview Rockville filed a petition for review in the Circuit

4

Shelter now presents us with the following question:

> Did the Tax Court err in ruling that where an operating senior living business is transferred, and the transfer includes both real property transferred by deed to be recorded in the land records as well as intangible business assets (*i.e.*, intangible personal property) transferred by assignment, state and county transfer taxes and state recordation taxes are imposed based on the total consideration paid for both the real property *and* intangible business assets, given that only the real property is or can be transferred by an "instrument of writing" under the relevant statutes?

We answer that question in the affirmative and reverse.

## DISCUSSION

### I.

### STANDARD OF REVIEW

"On appeal, we review the decision of the Tax Court, rather than the circuit court." *Blue Buffalo Co., Ltd. v. Comptroller of Treasury*, 243 Md. App. 693, 701 (2019). "The Maryland Tax Court is an adjudicatory administrative agency[,]" and as such, it "receive[s] the same judicial review as other administrative agencies." *Gore Enter. Holdings, Inc. v. Comptroller of Treasury*, 437 Md. 492, 503 (2014) (cleaned up). We look through the circuit court's decision and concentrate our attention on the Tax Court's decision. *Id*. As the scope of our review is cabined to the Tax Court's analysis, we "cannot uphold the Tax

Court for Montgomery County, and Brightview Towson and Brightview White Marsh filed separate petitions for review in the Circuit Court for Baltimore County. The parties to the Montgomery County action jointly moved to transfer the matter to the Circuit Court for Baltimore County, which was granted. After the transfer was completed, the parties moved to consolidate the three cases, which was also granted. Somewhere along the line, the Sellers assigned their refund claims to Shelter.

5

Court's decision on grounds other than the findings and reasons set forth by [the Tax Court]." *Id*. (internal quotations omitted).

The standard of review we apply turns on whether the Tax Court's decision was a question of fact, law, or mixture of both. *Id.* at 504-05. Here, the Tax Court's decision rested entirely on its interpretation of provisions of the Tax-Property Article of the Maryland Annotated Code. Generally, we will afford "great weight" to the Tax Court's legal conclusions regarding the statutes that it administers. *Id.* at 505. But, as recently explained by the Court of Appeals, "[t]hat degree of deference . . . is not determinative; 'a reviewing court is under no statutory constraints in reversing a Tax Court order which is premised solely upon an erroneous conclusion of law.'" *Travelocity.com n/k/a TVL LP v. Comptroller of Maryland*, No. 14, Sept. Term 2020, slip op. at 8 (Md. April 30, 2021). Here, the Tax Court's decision was predicated on statutes that it administers, but it did not concern a matter that required expertise in tax matters. Rather, the interpretation of the statutes we adopt here rests on our plain language review of the relevant provisions that, on their face, do not involve complicated concepts in the law of taxation. Accordingly, we shall review the Tax Court's legal conclusion without deference. *Id*. at 9.

## II.

## ANALYSIS

There are four taxes at issue in this case: the Maryland recordation tax, the Maryland transfer tax, the Baltimore County transfer tax, and the Montgomery County transfer tax. Although the relevant statutes imposing these taxes differ in some respects, the question of statutory interpretation is virtually the same for each, namely, whether the recordation and

6

transfer taxes incurred in the sale of a business are properly calculated against the value of both the intangible assets and the real property conveyed in the transaction.

Our journey into the weeds of the relevant statutory provisions will be easier if we first gain an understanding of what is meant by the term "intangible" assets. The Court of Appeals has explained:

> Intangible property is property which has no intrinsic and marketable value, but is merely the representative or evidence of value, such as certificates of stock, bonds, promissory notes, and franchises. Intangible property is quite different in nature from corporeal property, and there is an obvious distinction between tangible and intangible property. Intangible property is held secretly; that is, it cannot be readily located, and there is no method by which its existence or ownership can be ascertained in the state of its situs except, perhaps, in the case of mortgages or shares of stock. The value of intangible property is not easily ascertained . . . Things are either tangible or intangible. A tangible thing is one which has physical substance. All other things are intangible.

*Neuman v. Travelers Indem. Co.*, 271 Md. 636, 642-43 (1974) (cleaned up).

In this case, the intangible assets conveyed in the three transactions included: 1) the goodwill and licensing rights of the property and facility; 2) all trademarked and copyrighted materials connected with the business, including trade names, logos, and signs, and all original artistic materials;[4] 3) all advertising and promotional materials; 4) all advance rental, security, and other deposits; 5) all up-to-date business records including mailing lists, tenant and supplier lists and correspondence, accounting records and operating technology, and employee and management records, manuals, schedules, wage information, and job descriptions; 6) all contact media, including telephone and fax

---

[4] Except that Seller was permitted to continue to use the "Brightview" name in connection with other senior living facilities it continued to own and/or operate.

numbers, email addresses, websites, domain names and URLs connected to the business; 7) all transferable government licenses, permits, zoning rights, and rights-of-way; 8) all employment and franchise agreements, patents, licenses, and contract rights connected with the business, its improvements, and its electronic media; and 9) "Service Mark" registrations.

With this understanding in mind, we now turn to the principles that guide our analysis of the relevant statutes. Our objective in statutory interpretation is to understand and implement the intent of the General Assembly. *Bartenfelder v. Bartenfelder*, 248 Md. App. 213, 235 (2020). In doing so, "[w]e start with the statute's plain language which, if clear and unambiguous, will be enforced as written. We pay attention to the statute's grammar and sentence structure" and avoid constructions that are "illogical, unreasonable, and inconsistent with common sense." *Id.* (internal citations omitted). Further:

> We do not read a statutory provision in isolation. Instead, we consider its purpose, goal, and context as a whole. Examining the context of the statute includes construing provisions within the same section harmoniously, if possible. If the words of the statute are ambiguous, we look at its structure (including its caption), context, relationship with other laws, and legislative history, among other indicia of intent. Even if the words are unambiguous, a review of the legislative history may, in certain contexts, be useful to confirm its interpretation or to rule out "another version of legislative intent alleged to be latent in the language."

*Id.* at 235-36. (internal citations omitted)

Armed with a working definition of "intangible" assets and mindful of the principles of statutory construction that inform our analysis, we turn to the statutory provisions at issue here.

8

# A.

## MARYLAND RECORDATION AND TRANSFER TAXES

State recordation and transfer taxes are set forth in Titles 12 and 13, respectively, of the Tax-Property Article. We will first address the provisions regarding the recordation tax.

## 1.

## Maryland Recordation Tax

The efficacy of certain types of instruments depends on whether they have been recorded. For example, legal title to real property does not transfer until the deed is properly executed and recorded in the land records maintained on a county-wide basis by the clerks of their respective circuit courts. Md. Code Ann., Real Property Article ("RP") § 3-101(a) (1974, 2015 Repl. Vol.); RP §§ 3-301 to 3-303 (setting forth the requirements for county clerks keeping land record books and indexes); *see also Kingsley v. Makay*, 253 Md. 24, 27 (1969). It is also permissible to record other types of instruments creating interests in real property, such as mortgages. RP § 3-102. While recording such instruments is not mandatory, *see Kingsley*, 253 Md. at 27-28, it certainly has its advantages. Namely, the recording process provides third parties with constructive notice of the security interest in the property and establishes priority of such interests based on the date of recordation. RP §§ 3-201, 3-203; *see also In re Levitsky*, 401 B.R. 695, 720 (Bankr. D. Md. 2008) (explaining that Maryland is a race-notice jurisdiction, meaning that if a grantor conveys the same interest to two separate bona fide purchasers, the interest recorded first takes priority).

An instrument granting an interest in real property is recorded in the circuit court of the county where the property is located. RP § 3-103. The party presenting the instrument for recording must include an intake sheet which discloses, among other things, "the amount of consideration payable, including the amount of any mortgage or deed of trust indebtedness assumed, or the principal amount of debt secured[.]"[5] RP § 3-104(g)(3)(iv). The party must also include a certification from the county tax collector that all taxes currently due or owed on the property, including transfer and recordation taxes, have been properly paid. RP § 3-104(a)(1)(i), (b). If a party fails to demonstrate that all taxes have been paid, the county clerk is not permitted to record the instrument. RP § 3-104(b). Thus, in Maryland, "[t]he recordation tax is, *inter alia,* an excise on the privilege of using the recording offices of the clerks of the circuit courts" for recording conveyances of real property and for perfecting security interests in personal property.[6] *Prince George's Cnty. v. Brown*, 334 Md. 650, 662 (1994).

---

[5] In the alternative, the party may include an endorsement from the assessment office for the county. *See* RP § 3-104(a)(1)(ii), (g)(8).

[6] Though not addressed above, a security interest in personal property may also be recorded to perfect the interest. *See* Md. Code Ann., Commercial Law Article ("CL") §§ 9-310, 9-501.1 (1975, 2013 Repl. Vol). This is done by filing a financing statement with the State Department of Assessments and Taxation ("SDAT"). CL § 9-501(a). The rules for filing such instruments vary based on the type of personal property securing the underlying obligation, but they generally serve the same purpose of providing notice and establishing priority of the interest. *See generally* CL §§ 9-301 to 9-342.

Under the Tax-Property Article, the recordation tax "is imposed on an instrument of writing." Md. Code Ann., Tax-Prop. ("TP") § 12-102 (1986, 2019 Repl. Vol.).[7] As discussed above, the types of instruments that get recorded are those that convey an interest in real property, or instruments that convey a security interest in real or personal property. In alignment with this reality, an "instrument of writing" is defined as a written instrument that either "(i) conveys title to or creates or gives notice of a security interest in real property; or (ii) creates or gives notice of a security interest in personal property." TP § 12-101(j)(1). Moreover, the phrase "real property" is defined as "land or any improvements to land." TP § 1-101(gg)(1). Here, we are concerned with the recordation taxes imposed on the deeds conveying the real property where the senior living facilities operate. Thus, for our purpose, the relevant type of "instrument of writing" is one that "conveys title to . . . real property," *i.e.* title to the land and the improvements on the land. *See* TP § 12-101(j)(1). Conveyances of intangible property do not figure into the equation.

The next step is to determine how the recordation tax is calculated. The answer is found in TP § 12-103, which states that when real property is conveyed, the recordation tax is calculated as a percentage of the "consideration payable . . . for an instrument of writing." TP § 12-103(a)(1). The recordation tax on an instrument of writing that conveys a security interest, however, is not based on the "consideration payable," but instead is calculated as a percentage of "the principal amount of the debt secured[.]" *Id.* Building

_____

[7] TP §12-102 states in full: "[e]xcept as otherwise provided in this title, recordation tax is imposed on an instrument of writing: (1) recorded with the clerk of the circuit court for a county; or (2) filed with the Department and described in § 12-103(d) of this title."

11

upon our understanding of an "instrument of writing" gained in the previous paragraphs, the recordation tax on a deed conveying real property is calculated as a percentage of the "consideration payable" for the land and the improvements thereon. We must next determine what "consideration payable" means.

Fortunately, the answer lies in the statute as well. Under TP § 12-103(a)(2), "consideration" is defined to include "the amount of any mortgage or deed of trust assumed by the grantee," but otherwise "includes *only* the amount paid or delivered in return for the sale of the property[.]" TP § 12-103(a) (emphasis added). Leaving nothing to chance, the statute tells us that the "consideration payable" will be found in one of two places: "(1) the recitals or the acknowledgement of the instrument of writing; or (2) an affidavit under oath that accompanies the instrument of writing" signed by a party to the instrument of writing or the party's agent. TP § 12-104(a).

Applying these provisions to the facts of this case is straightforward. The instruments of writing at issue here are the three deeds pursuant to which title to the real property was conveyed, and thus, the recordation tax should have been calculated as a percentage of the consideration stated in each of the three deeds.

The Taxing Authorities contend that the clause in TP § 12-103(a)(2)(ii)—stating that consideration "includes only the amount paid or delivered in return for the sale of the property"—doesn't distinguish between real or personal property. The Taxing Authorities point out that under TP § 1-101(cc), "property" is defined to include both "real property and personal property." Thus, their argument goes, because intangible property is a form

12

of personal property, it may be properly included in the calculation of the recordation tax. We are not convinced.

It is, of course, true that throughout the Tax-Property Article, the word "property" can refer to both "real" and "personal" property. Whether any particular use of the word "property" refers to one or both types of property, however, depends on the context. In TP § 12-103(a)(2)(ii), the word "property" is used in connection with determining the "consideration payable" for an "instrument of writing." Again, the type of "instrument of writing" relevant here is a deed transferring title to the real property. As observed above, "consideration payable" is a concept used only when calculating the recordation tax on an instrument of writing that conveys title to real property.[8] *See* TP § 12-103(a)(1). Thus, the word "property" as used in TP § 12-103(a)(2)(ii) refers only to real property. We therefore disagree with the Taxing Authorities' assertion that the text of the statute allows for the inclusion of intangible property when calculating the recordation tax on the transfer of real property.[9]

---

[8] In contrast, to calculate the recordation tax on an instrument of writing that grants a security interest (in either real or personal property), the relevant figure is the "principal amount of the debt secured." TP § 12-103(a)(1).

[9] We have our doubts that the Taxing Authorities' interpretation would withstand a challenge under Article 14 of the Maryland Declaration of Rights, which states "[t]hat no aid, charge, tax, burthen or fees ought to be rated or levied, under any pretense, without the consent of the Legislature." The parties did not raise this issue, and because we resolve this case on other grounds, we shall not address it. *See Sumpter v. Sumpter*, 427 Md. 668, 684 n.10 (2012) (citations omitted) (noting that the doctrine of "[c]onstitutional avoidance" mandates that a court "will not reach a constitutional argument when an issue may be decided on a non-constitutional basis").

Our conclusion is bolstered when considered in conjunction with the General Assembly's relatively recent amendments to the recordation and transfer tax provisions. A loophole once existed that allowed buyers and sellers of real property to avoid recordation and transfer taxes. *See* Fiscal Note, 1st Spec. Sess., S. B. 2 (Md. 2007). Instead of transferring title to the property, the parties would transfer the ownership interests of the entity that owned the property. *Id.* For example, let's assume that the real property is owned by a corporation, and that 100% of the shares of the corporation are owned by one person. Before the loophole was closed, the recordation and transfer taxes could be avoided by transferring the stock instead of the property.

In 2008, the General Assembly closed the loophole by imposing recordation and transfer taxes on such transactions. *See* TP §§ 12-117, 13-103; s*ee also* Fiscal Note, 1st Spec. Sess., S. B. 2 (Md. 2007). To do so, the General Assembly had to take into consideration certain realities that differentiate the purchase of the real property from the purchase of the stock. The one most relevant here is the fact that a business entity, such as a corporation, may own other assets in addition to the real estate, and the extent of the business's value attributable to its real property varies from one business to the next. For one business, the real property may represent a small part of the company's overall value, and in another, it could represent nearly all of its value. The less the real property contributes to the company's value, the less the transaction would resemble a ploy to avoid recordation

14

and transfer taxes. The General Assembly had to draw the line somewhere, and did so by defining the term "real property entity" as:

> a corporation, partnership, association, limited liability company, limited liability partnership, other unincorporated form of doing business, or trust that directly or beneficially owns real property that:
>
> > 1. constitutes at least 80% of the value of its assets; and
> >
> > 2. A. has an aggregate value of at least $1,000,000; or
> >
> > B. is the product of an untaxed conversion from a sole proprietorship effected under the exemption provided under § 12-108(y) of this title.

TP § 12-117(a)(6).[10]

In addition, the General Assembly had to decide whether the recordation and transfer taxes would be charged against the entire consideration the purchaser paid for the stock, or whether to adjust for the value of the other assets owned by the corporation. The General Assembly's resolution of this issue is reflected in TP § 12-117(b), which, in relevant part, states:

> (b)(1) The recordation tax is imposed on the transfer of a controlling interest in a real property entity **as if the real property, directly or beneficially owned by the real property entity, was conveyed by an instrument of writing** that is recorded with the clerk of the circuit court for a county or filed with the Department under § 12-102 of this title.

---

[10] The form of business entity we use in our example is a corporation, but it would work just the same if we had used another business form such as a limited liability company ("LLC") or partnership. If the entity is an LLC, the change of control is effectuated through the sale of membership interests in the LLC. Similarly, the change of control of a partnership is effectuated through a sale of the partnership interests. For our discussion, we are using the example of a stock sale, but the analysis holds for each type of "real property entity."

15

(2)(i) The recordation tax is imposed on the consideration payable for the transfer of the controlling interest in the real property entity.

(ii) The consideration to which the recordation tax applies includes the amount of:

> 1. any mortgage, deed of trust, or other lien on or security interest in the real property directly or beneficially owned by the real property entity; and

> 2. any other debt or encumbrance of the real property entity.

(iii) **The consideration to which the recordation tax applies is reduced by the amount allocable to the assets of the real property entity other than real property**.

(iv) The real property entity has the burden of establishing to the satisfaction of the Department the consideration referred to in subparagraph (i) of this paragraph and the amount of any consideration allocable to assets other than real property referred to in subparagraph (iii) of this paragraph.

(v) If the real property entity fails to establish the amount of consideration referred to in subparagraph (i) of this paragraph, the recordation tax is imposed on the value of the real property, directly or beneficially owned by the real property entity, determined by the Department at the date of finality immediately before the date of the final transfer.

(Emphasis added).[11]

As Shelter points out, subsection (b)(2)(iii) expressly excludes from the calculation all assets except real property. Shelter contends that this shows that the General Assembly

---

[11] To close the loophole in the transfer tax context, the General Assembly amended the transfer tax provisions in the same fashion. *See* TP §§ 13-103(a) (incorporating the definition in TP § 12-117 of "real property entity"), 13-103(b)(1) (imposing the transfer tax using the same words used in TP §§ 12-117(b)(1)), and 13-103(b)(2) (incorporating provisions of TP § 12-117(b)(2)). Thus, although our analysis is framed in terms of the recordation tax, it applies to the transfer tax as well.

16

never intended to apply the recordation tax to the conveyance of any asset other than real property.

The Taxing Authorities look at the same provision and draw the opposite conclusion. They argue:

> Section 12-117 shows that the General Assembly knows how to exempt non-real-property assets from taxation when it wants to. The tax statutes that apply to recorded deeds do not contain a similar exemption for non-real-property assets. *See generally* [TP] § 12-108 (listing exemptions). The General Assembly even amended [TP] § 12-103 (the law that governs this case) after it created [TP] § 12-117 (the inapplicable law) but did not add the language Shelter now seeks to insert. Under the "long accepted" doctrine of "*expressio unius est exclusio alterius,*" the Legislature's choice to pare down taxes for control transfers suggests that the [L]egislature chose not to pare down taxes on recorded instruments.

(Footnotes omitted).

The Taxing Authorities offer possible reasons why the General Assembly excluded any property other than real property in TP § 12-117. For example, they posit that the General Assembly wanted "to make corporate-ownership interests easier to alienate; that the deduction would not affect much intangible property" and that the "SDAT is better positioned" than county clerks to scrutinize the values assigned to the assets owned by a real estate entity. We disagree.

The General Assembly telegraphed its intent in the opening words of TP § 12-117(b)(1), which state that the "recordation tax is imposed on the transfer of a controlling interest in a real property entity **as if** the real property. . . was conveyed by an instrument of writing that is recorded" with the county clerks. (Emphasis added). In other words, the General Assembly wanted as little daylight as possible between the taxes imposed on a

17

stock sale and the tax imposed on a deed of conveyance. To achieve this goal, the General Assembly determined that in the entity sale, only the real property mattered, and all other assets were expressly excluded. No such adjustment is necessary if the real property is conveyed by an instrument of writing, even if the conveyance of the real property is part of a transaction in which the entire business is sold. And there is a reason for that.

As explained above, and as was the case here, in the sale of a business, the transfer of different types of assets is accomplished through different types of instruments. When title to real property is transferred, the county taxing authorities are presented with a very specific type of instrument of writing—a deed—that conveys title to a very specific type of asset—real property. As shown above, the "consideration payable" for the deed is, by statute, limited to the amount paid for the real property and its improvements. In other words, the consideration paid for the intangible property was never included in the deed in the first place. Thus, unlike the statutory provisions relating to the stock sale, no express exclusion of other types of assets was necessary.

**2.**

**Maryland Transfer Tax**

Our analysis of the parallel provisions in the transfer tax statute produces the same result. As is the case in the recordation tax statute, the transfer tax is imposed on an "instrument of writing" that is "[r]ecorded with the clerk of the circuit court for a

18

county[.]"[12] TP § 13-202. The statute's definition of an "instrument of writing" is virtually identical to its counterpart for recordation taxes, although it has some differences worth noting here. As will be recalled from the discussion above, the priority of a security interest in real or personal property depends on when notice of the security interest was recorded. Thus, in the recordation tax statute, an "instrument of writing" includes instruments that grant or give notice of security interests in real or personal property. *See* TP § 12-101(j). In contrast, the transfer tax statute does not apply to transfers of personal property or security interests in either real or personal property. TP § 13-101(e). Thus, in the transfer tax statute, an "instrument of writing" is limited to "a written instrument that conveys title to, or a leasehold interest in, real property." TP § 13-101(e)(1).

The rest of the analysis of the transfer tax statute tracks the analysis of the recordation tax statute. The transfer tax is based on a percentage of the "consideration payable for the instrument of writing." TP § 13-203(a)(1). For our purposes here, "consideration includes . . . only the amount paid or delivered in return for the sale of the property[.]" TP § 13-203(a)(2)(ii). The consideration payable is set forth in "the recitals or the acknowledgement of the instrument of writing" or in a statement under oath accompanying the instrument of writing signed by a party to the instrument or the party's agent. TP § 13-204. Thus, as with the recordation tax, the consideration stated in the deed

---

[12] TP § 13-202 states in full: "[e]xcept as otherwise provided in this subtitle, a transfer tax is imposed on an instrument of writing: (1) recorded with the clerk of the circuit court for a county; or (2) filed with the Department and described in § 12-103(d) of this article."

is the relevant number for calculating the transfer tax, and the value of the intangible property conveyed in the underlying transaction is not part of the equation.

**3.**

**County Transfer Taxes**

We reach the same result in our analysis of the relevant provisions of the Baltimore and Montgomery County codes. Baltimore County imposes a transfer tax on "instruments of writing," Baltimore County Code ("Balt. Cnty. Code") § 11-3-203(a), defined as "written instrument[s] that convey[] title to, or a leasehold interest in, real property." Balt. Cnty. Code § 11-3-201(1). The transfer tax is calculated as a percentage of the "consideration paid or to be paid by the transferee in exchange for the conveyance evidenced by the instrument of writing[.]" Balt. Cnty. Code § 11-3-203(b). Similarly, the Montgomery County Code imposes a transfer tax on "each transfer in the County of a fee simple interest in real property," which is to be "computed on the value of the full consideration for each transfer[.]" Montgomery County Code ("Mont. Cnty. Code") § 52-31.[13]

As was the case with Maryland's recordation and transfer statutes, a plain-language interpretation of the code provisions from both counties limits the taxes to consideration

---

[13] Montgomery County also imposes a transfer tax on "the initial transfer of stock or other evidence of ownership in a cooperative housing corporation or similar entity" and "each transfer of a leasehold interest in real property where the lease or instrument by which a leasehold interest is transferred contains a covenant for perpetual renewal[.]" Mont. Cnty. Code § 52-31.

paid for the real property. Consideration exchanged for intangible personal property is not

included in these definitions and thus, is not taxable.[14]

**B.**

**THE RELEVANCE OF THE PARTIES'
ALLOCATION OF THE PURCHASE PRICE**

The Taxing Authorities contend that the price allocations by the parties were suspect

and that the Tax Court properly focused on the total consideration paid in the overall

transaction (less the value of the tangible property). In that regard, the Taxing Authorities

maintain that the recordation and transfer taxes are imposed against the "'actual

consideration' and direct[ed] tax collectors to tax the entire payment for the elder-care

centers, not just the portion of the payment that Shelter allocated to real property." As the

Taxing Authorities put it:

> The parties to the sale here agreed on one price, then allocated portions of
> that price to different assets for income tax purposes. They did not separately
> bargain for the sale of real property to reach an arm's-length deal for only
> the land and its improvements. The parties' after-the-fact effort to clarify
> and limit their federal income-tax exposure should not affect their transfer
> and recordation-tax exposure.

(Internal citations omitted).

The Taxing Authorities also contend that our interpretation would produce the

unwelcome result of allowing parties to the sale of a business to engage in "tax avoidance

ploy[s]" when allocating purchase price to various assets. They argue that unscrupulous

---

[14] Further bolstering this interpretation is the fact that both county codes expressly prohibit imposing any tax on intangible personal property. *See* Balt. Cnty. Code § 11-1-102(c)(1)(ii); Mont. Cnty. Code § 52-17(b).

21

parties would strive to minimize the recordation and transfer taxes through contrived allocations of the purchase price, and that the county clerks would lack the resources and expertise to prevent such mischief because valuing intangible personal property is often "difficult, and potentially arbitrary."

Although we agree that an examination of the underlying economics of the transaction is appropriate to ensure that the parties aren't engaging in a ploy to reduce recordation and transfer taxes, the Taxing Authorities' characterization of the transaction as a retroactive and self-serving exercise cannot be squared with what the limited record shows about these transactions.[15] It appears that, contrary to the Taxing Authorities' assertion, the parties did, in fact, "separately bargain" for the sale of the various assets conveyed in the transactions. For example, in the Rockville Contract, the section covering the purchase price stated as follows:

> At least ten (10) days prior to Closing, Seller shall prepare and submit to Buyer for its review, comment, and approval an allocation of the Purchase Price (and all other capitalized costs) among the various assets which constitute the Property in accordance with Code § 1060 and the treasury regulations thereunder (and any similar provisions of state and local law, as appropriate). Seller and Buyer shall work together, in good faith, to reach a final agreement on such allocation and shall report, act and file Tax Returns (including, but not limited to, Internal Revenue Service Form 8594) in all respects and for all purposes consistent with such final allocation agreed upon by Buyer and Seller. Neither Buyer nor Seller shall take any position

---

[15] The Tax Court record does not include each of the three contracts for the transactions at issue here. The three transactions were part of a larger transaction in which ten nursing homes were purchased and sold by the same or affiliated buyers and sellers. The record includes only the contract from the sale of Brightview Rockville's facility (the "Rockville Contract") and the sixth amendment to the Rockville Contract, which amended not only the Rockville Contract, but also the contracts for each of the other transactions. Included within the sixth amendment are the agreed-upon purchase price allocations for each of the ten transactions.

22

(whether in audits, tax returns or otherwise) that is inconsistent with such final, agreed allocation unless required to do so by applicable law. Notwithstanding any provision to the contrary in this Agreement, Closing shall not occur under this Agreement or any of the Completed Project Agreements or Development Project Agreements, as applicable, until Buyer and Seller have agreed upon the allocation of the Purchase Price.

As this section makes clear, the allocation of the purchase price across the three types of assets was a material term of the contract; indeed, under the last sentence of this provision, an agreement on the allocation was a condition precedent to closing. Notably, the record shows that several months after the parties executed the contract and just days before closing, they entered into a sixth amendment to the contract which, among other things, established the parties' agreed-upon allocations for all of the subject facilities, including the three at issue here.

There was a reason, grounded in federal tax law, that the contracts required the parties to agree upon the allocation of the purchase price before closing. Under 26 U.S.C. § 1060,[16] which was referenced in the above section of the contract, and its corresponding regulations, parties to the sale of a business through an asset sale are required to file a form with the Internal Revenue Service—Form 8594—setting forth the allocation of the sales price among the various types of assets. 26 C.F.R § 1.1060-1(e)(1)(ii). This is required because the tax ramifications of an asset sale may depend on the type of asset and the

_____

[16] 26 U.S.C. § 1060 is a statute in the United States Internal Revenue Code establishing "[s]pecial allocation rules for certain asset acquisitions."

23

seller's cost basis in the asset.[17] For example, gains on some assets are taxed at the ordinary income tax rate, and gains on other assets are taxed at the capital gains tax rate. *See* 1 ALAN S. GUTTERMAN, LEGAL COMPLIANCE CHECKUPS § 6:13. Tax matters— Classification of Assets for Tax Purposes (Jan. 2021 update).

In an asset sale, from a tax standpoint, the interests of the seller and buyer are not necessarily aligned, and in fact are often adverse. *See, e.g.*, 6A MICH. LEGAL FORMS § 25:21. Federal Taxes — Sale of Business Property (Aug. 2020 update) (explaining that "the seller's and buyer's [tax] interests are usually adverse"); *Langdon v. Comm'r of Internal Revenue*, 59 F. App'x 168, 170 (8th Cir. 2003) (stating that when parties have competing tax interests, the courts give greater deference to their allocation of the purchase price). For example, depending on the nature of the asset, a buyer may favor allocating as much of the purchase price as possible to depreciable assets with short lives such as covenants not to compete, whereas the seller may push to allocate as little as possible to the same asset. *See* 6A MICH. LEGAL FORMS § 25:21. The more the parties' interests diverge, the more likely the resulting allocation reflects an arms-length negotiation. In fact, when the Internal Revenue Service contests the allocations made by the parties, the level of scrutiny that federal courts give to the parties' allocation depends on whether the parties' tax interests are adverse or aligned. *See Langdon*, 59 F. App'x at 170-71.

---

[17] A cost basis is the original price of the property adjusted over time to account for improvement or depreciation of the property. *See* 26 U.S.C. §§ 1011-12. The gain or loss from selling the property is calculated for tax purposes by subtracting this adjusted cost basis from the sales price. 26 U.S.C. § 1001(a).

Here, whether the parties' interests were aligned cannot be ascertained on this record, but right now, that is beside the point. The possibility (indeed, likelihood) their interests were adverse allows for the possibility that their allocations were the product of good faith, arms-length negotiations over the true value of the various assets. On remand, as the parties move into the second phase of the bifurcated proceedings, this issue may be explored.

Although we don't take lightly the possibility that the allocation process could be used to understate the value of the real property as a tax avoidance ploy, our holding—that the value attributed to the intangible assets is not considered in the calculation of the recordation and transfer taxes—does not mean that the county clerks must blindly accept the parties' allocation of the purchase price. To the contrary, the clerks may look through the stated consideration on the deed to the facts and circumstances of the underlying transaction to ascertain the actual consideration paid for the real property. *See, e.g.*, *Dean v. Pinder*, 312 Md. 154, 162 (1988); *Pritchett v. Kidwell*, 55 Md. App. 206, 213-14 (1983) (in determining consideration relevant for calculating recordation and transfer taxes, "we must give regard to the reasonable expectations of the parties: tax avoidance ploys aside, what did they consider the bargain to be?").[18]

---

[18] The Taxing Authorities contend that these cases support their position because they both confirmed the county clerks' authority to examine a transaction to determine the actual consideration paid for the real property beyond the amount stated by the parties on the instrument of writing. We agree with that general proposition. But these cases do not stand for the proposition that the clerks can include in their calculations the consideration exchanged for other assets.

Whether county clerks have the expertise or resources to scrutinize a transaction to weed out the value of the intangible property is beyond our purview, although we hasten to point out that they are empowered by their respective county codes to inquire into the parties' valuations. If they have reason to second-guess the consideration stated in the deed, they also may calculate the recordation and transfer taxes on the fair market value of the property.[19] *See* Balt. Cnty. Code § 11-3-207(d) ("If a taxpayer . . . is unable to show affirmatively to the Director [of Finance] what the consideration paid or to be paid for the property is, the Director may base the transfer tax on the market value of the property transferred."); Mont. Cnty. Code § 52-36(b) (permitting that "[w]here the director of finance has reason to believe that the consideration for property or valuation of property is understated . . . [the director] may request the supervisor of assessments for the county or a professional real estate appraiser to make an appraisal of the property," and may consider such an appraisal when making the ultimate determination of taxes due). These options, we must presume, reflect a belief by the county legislative bodies that the clerks have the requisite knowledge and resources to make sure the actual consideration exchanged for the real property serves as the basis on which the recordation taxes are imposed.[20] In any event, if resources or expertise are lacking, that is a matter for the legislative bodies to address.

---

[19] Maryland state recordation and transfer taxes are collected by the clerks of county circuit courts alongside the county transfer taxes. *See* TP §§ 12-110(a), 13-208(a).

[20] In addition, as discussed above, the parties are required under federal tax law to allocate the purchase price across the various asset classes. *See* 26 U.S.C. § 1060(a); 26 C.F.R. §1.1060–1. A fraudulent allocation carries serious consequences under federal law. *See* 26 U.S.C. § 6721(e) (describing penalties imposed for cases of intentional disregard

## CONCLUSION

The Tax Court made a legal error in its determination that "State and local tax collectors" are permitted "to impose transfer and recordation tax based on the total amount of consideration paid, including any consideration paid for assets that are categorized by the buyer or seller as intangible property." We hold that in determining the "total amount of consideration paid," the tax collectors must calculate the tax on the consideration paid only for the subject real property and must exclude consideration paid for other types of assets, such as intangible property, that are not subject to such taxes. As noted above, in so holding, we do not suggest or imply that the tax collectors must blindly accept the consideration stated by the parties. Rather, tax collectors are permitted to look through the stated consideration to the underlying bargain to ascertain what the parties actually "consider[ed] the bargain to be." *Pritchett*, 55 Md. App. at 214.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY REVERSED; CASE REMANDED TO CIRCUIT COURT WITH INSTRUCTIONS TO REMAND TO TAX COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEES.**

---

for asset allocation reporting requirements, including a fine of up to ten percent of the aggregate amount of the items required to be reported). In addition, the risk of criminal penalties associated with fraudulent tax filings provides a check against the impulses some may have to engage in such mischief. *See, e.g.*, 26 U.S.C. § 7206.